[No. 38697.    Department Two.    March 2, 1967.]

THE STATE OF WASHINGTON, *Respondent*, v. JOHN P. KOHLER
*et al.*, *Appellants*.*

*E. Paul Schumann* and *B. Gray Warner*, for appellants.

*Charles O. Carroll* and *Herbert L. Onstad*, for respondent.

LANGENBACH, J.†—The defendants were convicted of having robbed a tavern on 24th N. W. in the Ballard District of Seattle. The primary issue is whether the police officers who arrested them without warrants had probable cause to believe that the defendants had committed that felony. Defendants argued that they were arrested on suspicion only and moved to suppress all evidence obtained as a result of the arrest. The denial of that motion, resulting in the introduction of the challenged evidence at trial, is the gravamen

*Reported in 424 P.2d 656.

†Judge Langenbach is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

of the defendants' appeal from the robbery conviction. (Counsel on appeal were not the defense counsel at trial.)

The robbery occurred at 11 p.m., October 4, 1965. Within 2½ hours all of the events with which this appeal is concerned had transpired.

The tavern's owner, Beane, testified at the pretrial hearing that he was held up by two white males whose faces were covered by stocking masks. Within minutes he gave what description he could to the police. The "shorter" of the two white males was 5 feet 6 to 5 feet 8 inches in height; he stayed by the door of the tavern during the robbery. The "taller" of the two men was between 6 feet and 6 feet 2 inches in height; he carried a .22 caliber rifle, came all the way into the tavern and took the money. The taller man wore a dark zippered jacket while the shorter man had on a light jacket; the taller man wore a pair of dark, levi-type pants while the shorter wore lighter pants similar to his jacket.

Larry King was a railway switchman riding to work on a bus that night. He was sitting opposite the bus driver on the long seat which ran parallel with the length of the bus. He was turned forward from the waist looking out the front window of the bus as it proceeded south on 24th N. W. As the bus neared the tavern, King saw two men on the street, some 10 to 20 feet south of the tavern door. They were running south. When they were half way to the street corner the bus was almost even with them. About 20 feet from the corner, the shorter, stockier of the two men cut through the hedge. He carried some object in his hand. The taller man ran on to the corner and turned west stopping at the driver's side of a car parked about 15 to 20 feet off 24th N. W. As the taller man opened the door the dome light came on revealing a rifle held in his left hand. He climbed into the car. By this time the bus was three-quarters of the way through the intersection and King was standing up in the aisle looking toward the rear. Because the bus moved out of range he did not see the car drive away. King told the bus driver that it looked like a robbery and should be

reported. Within 15 minutes he was giving the police a statement.

King told the police that the taller man was around 6 feet tall and the other was shorter and stockier. The taller man, slimmer in build, wore an even colored combination of clothing darker in color than that worn by the shorter man. The shorter man wore a lighter pair of trousers and a fairly tan or dark jacket. He described the jackets as par-ka-type, short, not long to the knees. He could not say whether the jackets were zippered. He gave the police the following description of the car: It was a 1953 or 1954 Ford station wagon, lighter colored on the top and a darker color on the bottom. He told the officers that the tall man with the rifle got in on the driver's side and the shorter man got in on the passenger's side of the car. He had no idea of the men's ages and was unable to recognize the defendants in a police "lineup."

The foregoing testimony has no bearing upon the arrest and search. It is related merely to establish the sequence of events and the information which resulted in the police radio broadcast. The arresting officers acted solely upon the information relayed to them over the radio together with their own observations.

The arresting officers were Johnson and Fisher. Fisher was ill at the time of hearing and could not appear to testify. The following is based upon the testimony of Officer Johnson. The defendants did not testify at the hearing on their motion to suppress, nor at the trial which resulted in their conviction.

Around midnight on October 4, 1965, Johnson and his partner were on a routine patrol in the north end of Seat-tle. Johnson heard a police radio broadcast reciting that an armed robbery of a tavern had taken place in the Ballard district. The description was given of two white males: Number one was 20 to 25 years old, 5 feet 8 inches tall, ap-proximately 150 pounds, medium build. He was wearing light blue levi pants and a white or pale beige zippered ny-lon jacket. Number two was a white male, slightly taller,

approximately 5 feet 11 inches, 140 pounds, slender build, wearing light levi pants and a darker tan zippered nylon jacket. The men were alleged to have left the area in a dark, possibly dark green or blue and white two tone, dark body with lighter top, Ford station wagon, approximately a 1953 model. The broadcasts stated that the men were armed with a rifle and that some currency and rolled nickels had been taken in the robbery.

At about 12:30 a.m., October 5, 1965, Johnson and Fisher were stopped near a stop sign at 87th and 15th N. W. Johnson observed two white males southbound on 15th in a 1953 two-tone Ford station wagon, dark green with a white upper portion. The officers felt that the two young men matched in age and general build the description broadcast. However, one of the men was wearing a white "T" shirt and the other a light sweater. The officers could not tell their respective heights and weights or what kind of pants they were wearing.

The police car turned directly behind the suspect vehicle and followed it south on 15th for about a block and a half before pulling it over. While the officers were following the car and observing its occupants, the passenger turned and appeared to notice the police car following. He appeared to say something to the driver and at that point both men appeared to the police to become obviously nervous. They sat looking straight ahead, looking neither to the right nor to the left. Johnson said that he was struck by the change in their demeanor. He also stated that it appeared to the following officers that the passenger leaned forward and shoved something under the front seat. The police turned on their red dome light. Johnson stated that because they felt these were the robbery suspects and possibly armed, they also shined two spotlights into the interior of the car. The car immediately pulled over.

After the cars had stopped, Officer Fisher went to the passenger side of the car and the passenger (Robert Kohler) dismounted. Officer Johnson went to the rear of the vehicle and motioned the driver (John Kohler) to dis-

mount on the passenger side. As Johnson stood talking to defendants he looked into the interior of the car and saw on the seat behind the front seat two nylon jackets which matched the description broadcast over the police radio. The passenger door to the car was open and Officer Fisher shined his light on the floorboards revealing to the officers several rolls of rolled coins. At this point Fisher and Johnson indicated to each other their agreement that these were the robbery suspects, and defendants were placed under arrest. They were told that they were under arrest on suspicion of robbery. Their persons were searched and they were handcuffed.

The defendants were taken to a precinct station in separate cars. At the station Johnson advised John Kohler of his right to remain silent, his right to refrain from making a statement, and that he should call an attorney. John Kohler replied that he was aware of his rights and that he had nothing to say. He did not then attempt to call an attorney. The time was approximately 1:10 a.m., October 5, 1965, when John Kohler went to the men's room accompanied by Officer Johnson. While relieving himself, John Kohler told Officer Johnson that he would like to make a deal to get his kid brother off. Johnson replied that there could be no deal. At that time John Kohler asked to call an attorney. He was returned to the station's work room, given a Seattle telephone directory and told how to get an outside line. He opened the telephone directory to that section of the yellow pages dealing with attorneys. He called six times but received no answer. After the sixth call he said that he could call again from the jail. He said he would call his wife in the morning.

Detective Mullen testified that about 1:30 a.m., he talked to both defendants. Robert, the younger, had nothing to say. Mullen then identified himself to John Kohler and told him that he did not have to say anything, that he had a right to see an attorney before he said anything, and that anything he said could be used in a court of law. John asked why they were arrested. Mullen told him they had

been arrested as suspects in the robbery of a tavern. John Kohler then asked Mullen if the robbers had been masked. Asked why he wanted to know, John replied that if their heads had been covered they could not be identified. At that time, Mullen testified, John Kohler demanded the use of a telephone to call an attorney. He made six separate calls which Mullen assumed were attempts to get an attorney. It is not clear from the record whether Mullen and Johnson were testifying to the same six calls or whether John Kohler tried on two occasions to contact an attorney.

The defendants did not offer any testimony but stood upon their motion to suppress the evidence. After the hearing that motion was denied. The defendants offered no proof at trial and were convicted by the jury. They have appealed.

■ There were seven assignments of error, argued together. They pertain to the trial court's failure to sustain defendants' motion to suppress all articles taken from the automobile including the jackets, rolls of nickels and gun, together with any statements of the officers in reference thereto, as well as the inculpatory statements of the defendant John Kohler.

> If an officer believes *and* has good reason to believe that a person has committed, or is about to commit a felony, he may arrest without a warrant. This is but another way of saying that an officer must have probable cause to believe that a felony has been or is about to be committed and that the person arrested committed or is about to commit it. [Citing cases.] . . . Even a strong belief held in good faith if unsupported by the circumstances will be insufficient to make a search valid. [Citing case.] The probable cause essential to support an arrest without a warrant is a belief based upon facts within the knowledge of the arresting officer, persuasive enough to convince a judge that a cautious but disinterested man would also believe the arrested person guilty. [Citing cases.]
>
> If the arrest was lawful, *i.e.*, upon probable cause, then a search of the person, the immediate area and the nearby automobile became lawful. [Citing cases.] Such a search incident to a lawful arrest is permitted to protect

the arresting officer from assault by accomplices or hidden weapons and to prevent the destruction of evidence. [Citing case.] *State v. Darst*, 65 Wn.2d 808, 811, 399 P.2d 618 (1965).

■ Were the facts within the officers' knowledge and the circumstances under which the officers confronted the defendants sufficient in themselves to warrant in a cautious but disinterested man the belief that John and Robert Kohler had robbed the tavern? There are three elements in this question. (1) The belief of the officers, (2) the requirement that the belief be reasonably grounded, and (3) the coexistence of the first two elements at "the moment the arrest was made."[1]

A careful review of the record can result in no conclusion other than when the officers placed the Kohler brothers under arrest, the officers both believed them to be tavern robbers and had good reason for that belief. The officers knew that two white young males had robbed the tavern and made their getaway in a two-tone (dark blue or green bottom; light upper portion) Ford station wagon of approximately 1953 vintage. Less than an hour after receiving that information there drove past these officers two white young males in a 1953 two-tone (dark green bottom; light upper portion) Ford station wagon. That car was defendants' Achilles' heel; the improbability of two such cars carrying four such occupants at that time of night in this section of Seattle is manifest. When Officer Johnson was asked why he stopped the Kohler automobile he replied:

. The fact that the car matched the description and the occupants of the car matched the general description; the actions of the passenger upon noting the police car, and just their general demeanor after having noted the police car was behind them. These things all combined, and we felt we should stop them.

Because there was reasonable cause to arrest appellants, the motion to suppress the evidence obtained by the arrest

---

[1]*Beck v. Ohio*, 379 U.S. 89, 91, 13 L. Ed. 2d 142, 85 Sup. Ct. 223 (1964).

was properly denied. Appellants had been distinctly advised of their constitutional rights upon arrest. Consequently there was no error in the admission of the statements of John Kohler. The judgment and sentence is affirmed.

FINLEY, C. J., DONWORTH, ROSELLINI, and HAMILTON, JJ., concur.

May 22, 1967. Petition for rehearing denied.