[Nos. 359-41015, 41028, 41030-1.    Division One.    June 22, 1970.]
Panel 2

THE STATE OF WASHINGTON, *Respondent,* v. PHYRON BERKINS, *Appellant.*

THE STATE OF WASHINGTON, *Respondent,* v. KELLY CORNELIUS NORMAN, *Appellant.*

THE STATE OF WASHINGTON, *Respondent,* v. ALVIN CHARLES BUSH, *Appellant.*

*Bovy, Graham, Cohen & Wampold, Thomas S. Wampold, Norman Cohen,* and *Thomas P. Graham, III,* for appellants (appointed counsel for appeal).

*Charles O. Carroll, Prosecuting Attorney, Patricia G. Harber* and *Steve Paul Moen, Deputies,* for respondent.

HOROWITZ, A. C. J.—The defendants Berkins, Norman and Bush, tried together in a jury trial below, were convicted on charges of kidnapping and second-degree assault. The defendants Berkins and Norman were also convicted on charges of rape. Each defendant appeals claiming prejudicial error because of the trial court's refusal to suppress evidence obtained as a result of claimed illegal arrest of the defendant Berkins and the refusal to grant defendants a mistrial arising out of an incident involving the manacling of the defendants during a court recess.

On the evening of August 21, 1968, Hollis, a young girl, and her friend, Harold, a young man, were parked in a car in Seward Park sometime after midnight. About 3 a.m. they noticed a vehicle driving slowly around the automobile in which they were seated. It finally stopped next to their automobile. Several Negro men got out of their car, and one, later identified as the defendant Bush, came over and asked Harold for a cigarette and match. Harold said he had none, whereupon he was ordered out of the automobile at gunpoint, searched by defendants Bush and Norman and ordered to remove all of his clothes down to his shorts. He complied. Defendants Bush and Norman then took Hollis out of Harold's automobile and forced her into their automobile. Meanwhile, the other Negro men removed various items of personal property from Harold's car. Hollis was then driven to a house about 20 minutes away after an intermediate switching of cars and there she was raped by the defendants Berkins and Norman. She was then placed in a dark green Cadillac, either a '57 or '58 model—the same car in which she had been brought to the house—and was driven to and left at a point within a mile or so of her home. Meanwhile, after the abductors left with Hollis, Harold put on a spare set of clothes that he found in his car trunk, drove to a public telephone at a gas station and telephoned the police concerning the abduction. The police

arrived shortly thereafter. Harold then described the abductors including the car used by the kidnappers as a '55 or '56 black Cadillac with the right rear portion dented, and described one of the Negro men involved as 6 feet tall and heavy, and another as being very tall.

About 4 a.m. Seattle police officers Al Gerdes and Allen Lima, each of whom had served as officers for less than 2 years, received the initial radio report of the abduction over the police radio system. Officer Gerdes testified that

> a description was put out over the radio of a possible suspect vehicle involved in an abduction at Seward Park, and the description of the vehicle was a Cadillac in the mid—50's. It was described as a black Cadillac in a beat-up condition with damage to the right—I believe it was described as the right tail light that was damaged, and that it was excessively loud, the mufflers were bad.

The description also stated that there were five Negro males involved and that one was very tall and one very heavy. Officer Lima testified substantially to the same effect. He further testified that the officers received a further radio report from police headquarters changing the year of the suspect's car from a '54 or '55 to a '56 because the car had fins on back of it. Officer Gerdes upon receipt of the report commented to his partner that a '57 or '58 Cadillac also had large fins.

About 5:45 a.m., while cruising, the officers spotted a car in the Central area of Seattle

> that we felt fit this description real close. It was a very dark green, and to the point that in the dark it looked like it was black. When we first saw it, we thought it was black. It was a '58 Cadillac, but it did have damage to the rear, and the tail light lens was broken. It was unoccupied at this time.

The officers then drove up to the car, checked to see if the hood was warm in order to see if it was driven recently and found it to be very warm.

> It was an August night, but it had been cold that night . . . . There was nobody in it, so we drove on and relayed the information of what we saw. We reported

what the license plate number was, what time we saw it, and the location of it, and we later talked with a sergeant of the homicide and robbery division and told him what we had seen.

When the officers returned the car was gone but they again saw it about 9:10 a.m. in another location in the Central area in Seattle. At that time a large Negro man was sitting behind the steering wheel dozing. His eyes were closed as if he were asleep. The officers then notified the homicide and robbery division and were instructed to talk to the man and possibly to arrest him.

Officer Lima got out of the police car and approached the automobile in which the man was sitting. He finally stood about 2 feet from the car. He then asked the person behind the wheel to get out of the car, which he did. At that time Officer Gerdes had reached the right side of the car. When the person behind the wheel got out, Officer Gerdes asked him what his name was. He told him his name was Joe Douglas. He was later identified as the defendant Berkins. Officer Gerdes then asked the person who had identified himself as Joe Douglas if it was his car and he said it belonged to his brother. He was then asked where his brother was and he said he didn't know because he had had the car that night. Officer Gerdes then asked him if anyone else had used the car and he said he had had the car since the evening before and no one else had driven the car. Officer Gerdes testified that at the time he approached the car he had not decided to arrest the man behind the wheel because, as he testified: "Anybody could have walked in the car." However, after the man had answered that he had had the car since the night before, Officer Gerdes testified: "At this time we were quite sure that this car was the one used in the abduction, and we placed him under arrest, handcuffed him and put him in our prowl car where we advised him of his rights . . ." Officer Lima also testified that the man arrested requested the police officers to notify his grandmother. No other conversation took place in the drive to the police station. At trial the defendants were

identified; they did not testify and each was found guilty as above stated.

■ Defendants first contend that the arrest was unlawful and that their motion to suppress evidence obtained as a result of the arrest should have been granted; cf., *State v. Melrose,* 2 Wn. App. 824, 470 P.2d 552 (1970). The basic principles governing the duty of a police officer who makes a warrantless arrest for a felony are summarized in *State v. Bellows,* 72 Wn.2d 264, 266, 432 P.2d 654 (1967) as follows:

> In determining whether an officer has probable cause to arrest without a warrant, we are governed by the following rules. An officer need not have knowledge of evidence sufficient to establish guilt beyond a reasonable doubt, but only reasonable grounds for suspicion coupled with evidence of circumstances to convince a cautious or disinterested person that the accused is guilty. *State v. Green,* 70 Wn.2d 955, 958, 425 P.2d 913 (1967); *State v. Massey,* 68 Wn.2d 88, 89, 411 P.2d 422 (1966). We are concerned with probabilities which are not technical, but are factual and practical considerations of everyday life on which prudent men, not legal technicians, act. *Brinegar v. United States,* 338 U.S. 160, 175, 93 L. Ed. 1879, 69 Sup. Ct. 1302 (1949).

The practical considerations test was re-affirmed in *State v. Ellison,* 77 W.D.2d 888, 467 P.2d 839 (1970).

The determination to make the arrest is an act of judgment on the part of the police officer formed in light of the particular situation and with account taken of all circumstances. *Brinegar v. United States,* 338 U.S. 160, 93 L. Ed. 1879, 69 S. Ct. 1302 (1949). The information used by the police officer in making his determination of whether or not to arrest must be reasonably reliable; *e.g.,* information broadcast by police over their radio system to the officer involved. *State v. Kohler,* 70 Wn.2d 599, 424 P.2d 656 (1967); *Darby v. State,* 3 Md. App. 407, 239 A.2d 584, 590 (1968); *Sabbath v. United States,* 380 F.2d 108, 110, (9th Cir. 1967); see *People v. Webb,* 66 Cal. 2d 107, 56 Cal. Rptr. 902, 424 P.2d 342, 19 A.L.R.3d 708 (1967). It is his judgment rather than the judgment of a layman that is involved. *State v. Poe,* 74 Wn.2d 425, 445 P.2d 196 (1968). The practi-

cal considerations test does not necessarily require exact identity and detailed description of the car and person involved. Reasonable similarity, especially when coupled with other apparently incriminating circumstances may permit a reasonable inference of identity.

Tested by "practical considerations" and the foregoing principles, the arrest was lawful. The arresting officers had within their knowledge the following information (1) the suspect car was reported to be black. When the officers first spotted the appellant's vehicle they believed it to be black although it turned out to be dark green, and they believed that the car could reasonably have been mistaken for a black car in the dark; (2) the officers knew that the car in which the missing girl had been abducted was a Cadillac and the Berkins vehicle which the officers observed at 5:45 a.m. and again a little after 9 a.m. in the hours following the kidnapping was a Cadillac; (3) the officers knew that the earlier radio description was for an older model 1954 or 1955 Cadillac, but that the description was changed shortly thereafter to "possibly a 1956 Cadillac" because of the high sharp rear fins which the officers knew was also characteristic of 1957 and 1958 Cadillacs. This fit the description of the Berkins automobile; (4) the officers knew that the suspect vehicle was described by radio as being "beat-up" and with the taillight out on the back rear side of the car. The Berkins vehicle had a damaged right rear quarter panel and the right rear taillight was out; (5) the officers knew that the Berkins vehicle had been driven recently, which timing reasonably coincided with the time of the kidnapping, because the hood of the car was very warm; (6) the officers knew that the kidnapping was committed by four or five Negro men, one being 6 feet tall and heavy and that appellant Berkins fit this description, and (7) the officers knew that the appellant Berkins had possession of the suspect car all night and had been operating the vehicle before 5:45 a.m.

Defendants at oral argument contended for the first time that defendant Berkins' answers that he had had pos-

session of the car during the night preceding were answers obtained before the defendant Berkins had been warned of his Miranda rights (*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966)) and that, therefore, the answers could not be used as a basis of probable cause for arrest. The trial court, it is true, ruled that the answers were not admissible in the trial on the merits because given during the course of custodial interrogation. The court nevertheless held that the arrest itself was lawful. See *State v. Woody*, 73 Wn.2d 179, 437 P.2d 167 (1968). We are empowered to affirm its action in holding the arrest lawful even though our reason for doing so may be different from or even inconsistent with the reason given by the trial court in making another ruling not before us for review. *Grange Ins. Ass'n v. Eschbach*, 1 Wn. App. 230, 236, 460 P.2d 690 (1969).

■ The touchstone of admissibility of defendants' answers is whether they may be said to have been given in the course of custodial interrogation. It does not matter whether the arrest or significant physical restraint is lawful or unlawful. If unlawful, evidence obtained as a result of such restraint or arrest is suppressible. *State v. Melrose*, 2 Wn. App. 824, 470 P.2d 552 (1970). If, in addition, the answers are given in the course of custodial interrogation without Miranda warnings having been given (*Miranda v. Arizona, supra*) confessions or statements incriminatory or exculpatory given by the defendant to the police officer interrogating him are inadmissible unless knowingly and intelligently waived.[1]

The problem here is whether the questioning of the man at the wheel of the parked car after he got out at the

---

[1] In *Miranda v. Arizona, supra*, at page 444, the court held: "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

request of the police officers but before the officers had probable cause for arresting him, constituted custodial interrogation; and, if so, whether the answers so received prior to the giving of Miranda warnings, may be properly considered by the police officers in determining whether they had probable cause for arrest. There is no evidence that the police officers used any coercive techniques in either making their request of the man at the wheel to get out of the car or in questioning him thereafter. See *State v. Creach*, 77 W.D.2d 194, 198, 461 P.2d 329 (1969); *State v. Bower*, 73 Wn.2d 634, 440 P.2d 167 (1968); *State v. Nuckols*, 1 Wn. App. 189, 459 P.2d 979 (1969). The request was a reasonable method of checking the height and size of the man at the wheel to help the officers determine whether the man fit the broadcast description. Furthermore, the request could properly be considered independently justifiable as a safety precaution for the officers. See *State v. Lister*, 2 Wn. App. 737, 469 P.2d 597 (1970). Furthermore, the technique of requesting a suspect to step out of a car for the purposes of interrogation has been used before and since *Miranda*. (See *People v. Witt*, 159 Cal. App. 2d 492, 324 P.2d 79 (1958); *People v. Blodgett*, 46 Cal. 2d 114, 293 P.2d 57 (1956); *State v. Tellez*, 6 Ariz. App. 251, 431 P.2d 691, 25 A.L.R.3d 1063 (1967). In *State v. Tellez, supra*, a post *Miranda* case, the use of that technique during the investigatory phase of the police investigation was held noncustodial in character. Although the reasoning of cases involving custodial interrogation prior to formal arrest may not be entirely reconcilable, most of such cases and their reasoning support the view that during the investigatory period, and before there is probable cause for arrest, requesting or ordering a car driver to get out of a car without other coercive conduct by the police officers at the time of or during interrogation, does not place the driver in custodial status requiring Miranda warnings. See Annot. 31 A.L.R.3d 565, 596-606 (1970). It is only after the answers were given that the police officers had probable cause to believe that the person interrogated was involved in the

crime. It was at that point—not before—that the status of custodial interrogation began, thus requiring Miranda warnings. *State v. Creach, supra.* In our opinion, the answers were properly considered in determining whether there was probable cause for the arrest.

Defendants contend that their motion for mistrial should have been granted because of a manacling incident. Immediately after the jury was finally selected and sworn defendants' counsel moved for a mistrial. They stated that during the 15-minute recess of the day preceding, sheriff's deputies in attendance placed manacles upon the defendants and then removed the defendants so manacled from the courtroom during the recess period. At that time prospective jury members awaiting voir dire examination were still sitting in the courtroom. The 12 jurors that had entered the box had been taken back to the jury room. Neither the trial judge nor the deputy prosecutors were present when the incident occurred. No evidence concerning the incident was taken and no special findings were made concerning the incident or possible prejudice resulting therefrom. The court denied the defendants' motion, but invited defendants' counsel to request any other relief to obviate any possible prejudice. The defendants did not request other relief and no other relief was given.

In our opinion, there was no prejudicial error, or if there was error it was waived.

■ A jury is not an unsophisticated body of people. The sheriff's deputies were properly in attendance during the proceedings. *State v. Basford,* 1 Wn. App. 1044, 467 P.2d 352 (1970); RCW 36.28.010. Furthermore, a juror knows from his oath (RCW 10.49.100) and as a matter of common knowledge that a defendant in a capital case has been arrested for the crime for which he is being tried and is in custody. Juries also know that manacles are or may be used as a method of restraint. Nothing in the instructions given by the court was inconsistent with the principle that no inference of guilt of the defendants is to be drawn from the use of such restraint. This is not the case of the officers

deliberately acting to prejudice the rights of the defendants to a fair trial by wanton or malicious action. 47 Am. Jur. *Sheriffs, Police and Constables*, § 41 (1942). Even if one or more members of the jury panel ultimately selected saw the incident, the record as made fails to show prejudice. See *State v. Roberts*, 69 Wn.2d 921, 925, 421 P.2d 1014 (1966). Second, had the incident been promptly called to the trial court's attention, even in chambers, the court could have either excused the remaining members of the jury panel who were present in the courtroom when the incident occurred and obtained a new panel of jurors from the presiding judge's department, or, alternatively, the court could have been requested to promptly instruct the jury panel that no inference of guilt was to be drawn from the manacling incident. *State v. Ollison*, 68 Wn.2d 65, 411 P.2d 419 (1966); *State v. Sawyer*, 60 Wn.2d 83, 371 P.2d 932 (1962). When error can be obviated by jury instruction it is the defendants' duty to request such an instruction. If he does not do so, the error is deemed waived. *State v. Ollison, supra; State v. Smails*, 63 Wash. 172, 115 P. 82 (1911); *Spratt v. Davidson*, 1 Wn. App. 523, 463 P.2d 179 (1969). See *Hogenson v. Service Armament Co.*, 77 W.D.2d 209, 216, 461 P.2d 311 (1969).

After the appeal had been perfected and briefs filed by the respective parties, defendant Berkins, pursuant to ROA I-46, filed a supplemental brief (*State v. Massey*, 68 Wn.2d 88, 93, 411 P.2d 422 (1966)). That brief contains additional assignments of error not contained in the brief of defendant's counsel or of counsel for the other defendants. We have examined the additional assignments so made and find them without merit.

The judgment as to each defendant is affirmed.

UTTER and WILLIAMS, JJ., concur.