[No. 1822-2.    Division Two.    July 28, 1976.]

THE STATE OF WASHINGTON, *Respondent*, v. GEORGE DONALD TRICKEL, *Appellant*.

*John A. Strait*, for appellant.

*Christopher T. Bayley, Prosecuting Attorney*, and *Doug Smith, Deputy*, for respondent.

PETRIE, C.J—The defendant, George Trickel, was convicted of first-degree murder of Carolyn Boggs, the woman with whom he lived and whom he referred to as "my common law wife," and of second-degree assault upon her 18-year-old son, Donald Boggs, who lived with them. His appeal, following imposition of judgment and sentence, pre-

sents primarily two issues: (1) whether the trial court's mid-trial revocation of bail denied the defendant due process of law and deprived him of a fair trial because the manner and timing of the revocation (a) materially impeded his ability to assist in the preparation of his defense, (b) constituted an unwarranted comment on the evidence by the trial court, and (c) presented a high probability that outside influences tainted the jury's impartiality; and (2) whether the trial court's instruction defining the term "premeditated" allowed the jury to return a verdict of guilty to the crime of first-degree murder without the necessity of finding that the defendant did in fact form the requisite intent to commit that crime.

Somewhat secondarily, but nevertheless forcefully presented, the defendant contends the trial court committed reversible error by (3) unreasonably restricting the number of witnesses who would testify solely to the defendant's reputation for truth and veracity; and (4) prohibiting testimony as to the chief prosecuting witness' reputation for truth and veracity.

We affirm the conviction.

Carolyn Boggs died as a result of a single, perforating gunshot wound in the head. The projectile was fired from a very close range, perhaps as close as $\frac{1}{4}$ inch, entering in front of the right ear canal, and exiting slightly behind the left ear canal. The autopsy surgeon concluded the manner of death could have been either homicide or suicide. Both sides agree that the fatal weapon was a .22 caliber pistol.

Two persons were in Mrs. Boggs' home with her when the fatal shot was fired—George Trickel and Donald Boggs. Each related contradictory stories of the material events which preceded and followed the shooting. The defense to the murder charge was that Mrs. Boggs committed suicide.

The testimony of Donald Boggs, if believed by a jury, was devastating to any defense that Mrs. Boggs' death was self-inflicted. He testified that preceding the shooting, his mother and Trickel had been arguing; that Trickel "was pushing or shoving her;" that she called him a leech and a

parasite; that she wanted him to leave the house and if he did not she would call the sheriff; that Trickel insisted he wanted his .38 pistol, but Mrs. Boggs, who apparently had hidden it, twice stated "she would give it to him once he was out." Additionally, Boggs testified that moments before the shooting, he saw Trickel reach into the top drawer of a dresser (the drawer in which the fatal weapon was kept) in the master bedroom; that Trickel then closed the bedroom door; that he (Boggs) then "could hear a bullet being slipped into a clip" followed by a "loud jingling of keys;" that soon thereafter his mother went into the master bedroom; that within seconds she yelled "No, don't;" that he then heard a shot; and finally, that he heard a thud.

Boggs also testified that right after he heard the shot, Trickel came out of the bedroom with a .22 automatic pistol in his hand and pointed it at Boggs. Boggs told the jury that he thought Trickel was enraged and "was going to shoot me." Moments later, according to Boggs, Trickel returned to the bedroom, got a 7 mm. rifle, returned to the hallway, and "I pinned the rifle between him and I and the hallway, pointed up." Trickel broke down, "I asked him if he shot my mom," and he replied, "Yes." Trickel then indicated that he wanted to shoot himself with the rifle and subsequently asked Boggs to shoot him. Boggs then called the authorities, but before they arrived Trickel said to Boggs, "Listen, Donald, your mom killed herself," and Boggs replied, "No way."

Mr. Trickel expressed his relationship with Mrs. Boggs by testifying, "We loved each other very much;" that she suffered considerably from arthritis and "I would try to comfort her the best I could;" and that at "times I would sit down and cry with her." He told the jury that the day of the fatal shooting he drank 6 to 8 beers at a tavern and, returning home in the evening, had another beer with his nephew; that shortly before the fatal shot he did enter the master bedroom, but he exited by another door and went to the kitchen; that Mrs. Boggs made some remarks to him about sitting on furniture with greasy clothes and getting a

"smelly pole off the kitchen table;" that she then left the kitchen and went to the master bedroom; that he heard her open his dresser drawer; and that he heard two clicks, one "sounded like a clip put into the .22" and "the second one I heard was the breech being opened to be loaded;" that he left the kitchen, returned to the bedroom and Mrs. Boggs had her left hand on the gun barrel; that "she turned back real quick and fired;" that *he* shouted, "No, don't;" and that when he lunged at her, the ejecting shell struck his hand, and he caught the gun as it was falling.

Trickel then related that he entered the main hallway, encountered Boggs, but the pistol's "barrel was pointed to me." He specifically denied shooting Mrs. Boggs and threatening or assaulting Boggs.

Photographs taken by a King County detective at the scene of the fatality indicated that Mrs. Boggs' death occurred in front of a clothes closet and at the time of death she held in her right hand two clothes hangers containing some of her clothing.

On the fourth day of trial, July 11, 1974, and before the prosecution completed direct examination of Donald Boggs, the court recessed the trial and expressed the "basic thought" that the "defendant does pose a substantial danger to another or to the community, and that therefore this Court has discretion that he be detained." Thereupon, after brief argument of counsel, the court revoked Mr. Trickel's bail and remanded him to the custody of the sheriff.

We note, as did the trial court, that a superior court judge had initially set bail at $100,000, but that almost a month later and after a psychiatric examination indicated a lack of suicidal tendencies, alcohol problems, or danger to society, another judge authorized Trickel's release under specified conditions (one of which was that he "not be w/in the area of the Boggs residence") upon posting cash bail in the amount of $1,000.

With this background, we turn to the defendant's first contention—that because of the bail revocation he was denied due process of law and deprived of a fair trial. At this late

date we are obviously not asked to determine whether Mr. Trickel should be released on bail during trial; rather, our review is limited to consideration of whether he should be granted a new trial.

The defendant does not seriously challenge the power of a trial court to revoke bail at mid-trial—even without a specific hearing for that purpose as CrR 3.2(g) appears to require.[1] Indeed. the defendant directs our attention to a per curiam opinion of the Supreme Court of the United States in which the court indirectly at least acknowledged the inherent power of a United States District Court to revoke bail at mid-trial. *Bitter v. United States*, 389 U.S. 15, 19 L. Ed. 2d 15, 88 S. Ct. 6 (1967). In *Bitter*, the court declared at page 16:

> A trial judge indisputably has broad powers to ensure the orderly and expeditious progress of a trial. For this purpose, he has the power to revoke bail and to remit the defendant to custody. But this power must be exercised with circumspection. It may be invoked only when and to the extent justified by danger which the defendant's conduct presents or by danger of significant interference with the progress or order of the trial.

The *Bitter* court cited approvingly a memorandum of Mr. Justice Harlan in chambers in which he asserted his belief

> [T]hat, on principle, District Courts have authority, as an incident of their *inherent powers* to manage the conduct of proceedings before them, to revoke bail during the course of a criminal trial, when such action is appropriate to the orderly progress of the trial and the fair administration of justice.

(Italics ours.) *Fernandez v. United States*, 5 L. Ed. 2d 683, 686, 81 S. Ct. 642 (Harlan, Circuit Justice, 1961). *See also State v. Smith*, 84 Wn.2d 498, 527 P.2d 674 (1974). We hold, therefore, that the superior court does have inherent power

---

[1] CrR 3.2(g) provides in part:

"Upon the court's own motion or a verified application by the prosecuting attorney alleging with specificity that a defendant has willfully violated a condition of his release, a court shall order the defendant to appear for immediate hearing or issue a warrant directing the arrest of the defendant for immediate hearing."

to exonerate bail and order a defendant's confinement at mid-trial.

We proceed, then, to determine whether or not the trial court's revocation of bail produced a prejudicial error with respect to the process by which Mr. Trickel was convicted of first-degree murder. *United States v. Stroud*, 474 F.2d 737 (9th Cir. 1973).

The defendant does contend that the trial court's asserted reasons for the revocation do not satisfy the *Bitter* test. *Bitter* does not specifically recite the standard which an appellate court must apply when reviewing a trial court's mid-trial revocation of bail. In reversing the revocation order, the court did declare that in a criminal trial for mail fraud, a trial judge's mid-trial order of revocation was "unjustified" when the record reflected only the defendant's brief incident of tardiness and the revocation resulted in the defendant's commitment for the remainder of the trial in a jail 40 miles distant from the courtroom. The court also declared that the "order of commitment, made without hearing or statement of reasons, had the appearance and effect of punishment."

Although the *Bitter* court did not expressly state that the trial court abused its discretion, the generally acknowledged rule appears to be that a trial court has "inherent authority to remand the defendants into custody during trial in the exercise of a sound discretion." *United States v. Bentvena*, 288 F.2d 442 (2d Cir. 1961). In *Carbo v. United States*, 288 F.2d 282 (9th Cir. 1961), the court stated at page 287, "The trial court has wide discretion in the matter and may exercise such discretion without a record based on Wigmore evidence." Indeed, the court in *Bentvena* cautioned on page 444, "[T]he dangers of releasing a defendant on bail during the course of a trial are substantially greater than those existing before trial."

In the case at bench, the trial court clearly expressed its concern, after hearing a substantial portion of Donald Boggs' testimony, that Mr. Trickel's continued freedom on bail constituted a personal danger to a trial witness. Ac-

cordingly, the trial court revoked the defendant's bail. However, the order detaining the defendant provided that while confined during trial the defendant would be granted 24-hour attorney privileges and included the admonition that jail authorities "co-operate to let the defendant confer with his counsel at their offices."

We have already noted the effect of Boggs' testimony, if believed, upon Trickel's defense. The defendant contends, however, that the nature of Boggs' testimony was known to the authorities ever since he gave them a written statement the day after his mother's death, and was specifically known to the judge who set bail at $1,000 prior to trial. In its significant portions, Boggs' testimony was essentially the same as he had previously related to Officer Duncan of the King County Department of Public Safety approximately 12 hours after the fatal shooting. However, that fact does not reach the real issue, which is whether or not the trial judge abused the discretion afforded *to him* while presiding at trial.

We have previously described the responsibilities of a trial judge under circumstances not totally dissimilar:

> While he is presiding at a trial, the trial court is required to direct, control and regulate the proceedings as its chief officer. True, he has a grave responsibility to insure that a defendant charged with commission of a crime be given a fair and impartial trial. However, he has an equally grave responsibility to protect the other officers of the court as well as the members of the public in attendance. He must at all times maintain proper decorum and provide an atmosphere consistent with judicial dignity. When requested to perform a specific act which calls for a possible balancing of these grave responsibilities upon the scales of justice, the court must necessarily choose from among a wide variety of possible choices all within the permissible areas of judicial discretion.

*State v. Basford*, 1 Wn. App. 1044, 1050, 467 P.2d 352 (1970).

It is immaterial whether another judge, before trial, had been made aware of the nature of potential testimony in a criminal trial and, based in part thereon, had established

conditions of bail prior to trial. During the course of this trial, the trial court exercised the discretionary authority granted to it in the tense atmosphere of a first-degree murder trial. As expressed so well by Mr. Justice Harlan, we "cannot possibly have the same full 'feel' of the atmosphere of this . . . trial that the trial judge possesses." *Fernandez v. United States, supra* at 687. Under all the circumstances, we cannot say that the trial judge unreasonably exercised the discretion he is clothed with by the manner in which he balanced those grave responsibilities which he has to the defendant and to others. In any event, we specifically find that the defendant's confinement did not materially impede his ability to prepare his defense.

The defendant asserts, additionally, that the trial court's revocation of bail constituted a comment upon the evidence in violation of the prohibition contained in article 4, section 16 of the Washington State Constitution. A trial court's comment on the evidence in violation of the constitutional injunction constitutes reversible error unless it is apparent that the remark could not have influenced the jury even though the evidence commented upon is undisputed and overwhelming. *State v. Bogner*, 62 Wn.2d 247, 382 P.2d 254 (1963). The touchstone of error is whether or not the feelings of the trial court as to the truth value of the testimony of a witness have been communicated to the jury. *State v. Gitchel*, 5 Wn. App. 72, 486 P.2d 325 (1971).

In the case at bench, the prosecution concedes that had the court revoked bail in the presence of the jury, the constitutional mandate would have been violated. Nevertheless, the prosecution insists that the record is silent as to any communication of the court's decision to the jury. The defendant points to two facts which, he contends, indicate that the likelihood of the jury's exposure to the court's decision was exceedingly great: (1) the affidavit of defendant's trial counsel indicates that "at various times during the court proceedings" he observed a woman present as a spectator, whom he subsequently learned was "the girl friend of . . . the foreman of the jury," and that affiant

personally observed this woman and the jury foreman together in the courthouse during trial; and (2) on Friday evening, July 12, 1974, at the close of the first week of trial and after the jury (which was not sequestered) recessed for the weekend, at least one edition of the Seattle Times carried a news article, the last three paragraphs of which discussed the trial court's revocation of bail, including a comment that the judge "felt quite strongly that the defendant posed a substantial danger to Boggs or other members of the community."[2] A copy of the entire news story has not been made a part of the record, nor do we have any indication as to the prominence granted to the story in the edition which carried it. We do know that the headline recited merely: "Defendant Had Pistol, Youth Said."

We consider first, the presence of a friend of the jury foreman in the courtroom. There is no indication that the foreman's friend was actually present at the session when the court remanded Trickel into confinement; much less is there an indication that the friend, if she knew of the court's ruling, understood its significance or communicated it to the foreman.

■ Once it is established that the constitutional mandate has been violated, prejudice is presumed. *State v. Bogner, supra.* However, the defendant has the burden of establishing that the constitutional mandate has been vio-

---

[2] Guideline No. 6 of Guidelines for the Reporting of Criminal Proceedings adopted by the Bench-Bar-Press Committee of the State of Washington under our voluntary, cooperative Washington bench-bar-press program provides:

The news media are free to report what occurs in the course of the judicial proceeding itself. The bench should utilize available measures, such as cautionary instructions, sequestration of the jury and the holding of hearings on evidence after the empaneling of the jury, to insure that the jury's deliberations are based upon evidence presented to them in court.

Guideline No. 9 of the Guidelines for the Reporting of *Civil* Proceedings provides in part:

Newsmen should use care in reporting portions of jury trials which take place in the temporary absence of the jury. To publicize the court's rulings as to evidentiary matters, may cause jury prejudice.

lated, and that includes the fact that the court's comment on the evidence was communicated to the jury. The defendant reminds us that the constitutional prohibition against comment on the evidence by the court is strictly enforced, *Seattle v. Arensmeyer*, 6 Wn. App. 116, 491 P.2d 1305 (1971); and further, aside from the issue of whether the court commented upon the evidence, due process of law requires that he receive a trial by an impartial jury free from outside influences. *Sheppard v. Maxwell*, 384 U.S. 333, 16 L. Ed. 2d 600, 86 S. Ct. 1507 (1966). It is no longer necessary that the defendant affirmatively show actual prejudice; a demonstration that there was the probability of prejudice will suffice. *State v. Stiltner*, 80 Wn.2d 47, 491 P.2d 1043 (1971); *State v. Knapp*, 14 Wn. App. 101, 540 P.2d 898 (1975).

We know of no opinion, however, which purports to present criteria for ascertaining whether or not a "probability of prejudice" has been demonstrated. The jury was not polled, openly or in camera, as to its knowledge of the court's revocation of bail, conveyed either by the foreman's girl friend or by the newspaper story. *See Silverthorne v. United States*, 400 F.2d 627 (9th Cir. 1968). It is a question of judgment, therefore, whether publicity is of such a degree that it came to the attention of at least some of the jurors. *Calo v. United States*, 338 F.2d 793 (1st Cir. 1964). Most certainly, a trial court has the affirmative duty to take positive action to ascertain the existence of improper influences on the jurors' deliberative qualifications, whether of private talk or public print, and to take whatever steps are necessary to diminish or eradicate such potential improprieties which may arise during trial and of which the trial court has or ought to have some knowledge. *Silverthorne v. United States, supra*; and *see generally* American Bar Association Project on Standards for Criminal Justice, *Standards Relating to Fair Trial and Free Press* § 3.5 (Approved Draft, 1968).

In partial fulfillment of its responsibility to maintain the purity of the jurors' deliberative qualifications, the

trial court customarily admonishes the jurors not to expose themselves to media reports of the trial.[3] There is a general presumption that jurors carry out their duties honestly and in accordance with the instructions given them by the trial judge. *Myers v. Harter,* 76 Wn.2d 772, 459 P.2d 25 (1969).

In the case at bench, the record indicates the jury was impaneled and sworn in the afternoon of July 8, 1974, but the record does not disclose what admonition, if any, the trial judge presented to the jury at the evening recess. At the noon recess on July 9, the trial court reminded the jury of the necessity to return promptly at 1:30 p.m., and concluded by declaring simply: "Same admonition." At the evening recess, after noting the presence of several newspaper reporters who had been "in and out of the courtroom," the court admonished the jury as follows:

> Now, once again, I say do not, please,—if you scan the newspapers, don't read their articles. Don't read their articles until the case is all over, then you can go back

---

[3]Section 3.5(e) of the ABA Standards Relating to Fair Trial specifically provides that an admonition in the following form shall be given before the end of the first day if the jury is not sequestered:

> During the time you serve on this jury, there may appear in the newspapers or on radio or television reports concerning this case, and you may be tempted to read, listen to, or watch them. Please do *not* do so. Due process of law requires that the evidence to be considered by you in reaching your verdict meet certain standards —for example, a witness may testify about events he himself has seen or heard but not about matters of which he was told by others. Also, witnesses must be sworn to tell the truth and must be subject to cross-examination. News reports about the case are not subject to these standards, and if you read, listen to, or watch these reports, you may be exposed to misleading or inaccurate information which unduly favors one side and to which the other side is unable to respond. In fairness to both sides, therefore, it is essential that you comply with this instruction.

The commentary to section 3.5(e) states in part:

> If the announcement to the jury is stated as an *ipse dixit,* and no reminders are given throughout the trial, it surely will be of doubtful value. But if the rationale is carefully stated, and a reminder given at appropriate intervals, the chances of compliance are substantially enhanced. Of course a conclusive presumption of compliance would not be warranted, but the burden would at least be fairly placed on the party seeking to establish a violation.

and read them meticulously and analyze it from your position. But not one of these fine journalists has had the opportunity like you have. There's not one of them that has been here since 9:30 to 4:00 o'clock. So you are in a superior position. The important thing is that don't be involved. If somebody mentions something about that aspect, you know, be as objective as you can, skirt the issue and talk about something else and avoid the situation. Any violation that I hear, why, you know, sequestered you become, and I don't think you want to do that.[4]

The proper precautions to be taken by a trial court are inevitably dictated by the circumstances of each case; they must be designed to reasonably insure that no actual prejudice will occur. When prejudicial publicity during trial is massive and so timed as to present a high probability that the jury will encounter it, a presumption arises that actual

---

[4] Immediately before recessing the trial on the evening of July 11 (the date on which bail was revoked) the court told the jury:

"Bear in mind all of the prior admonitions I gave you. And I say to you, once again, that in this particular case it is most important to follow the admonition, and I will stress it again of not, not reading any particular portion of the newspaper regarding this case, or if parts of the newspaper are read that you disregard that from your mind immediately. And if there is any talk about this case, or anything, in the nature of your family, just completely disregard yourself from that."

On Friday evening, July 12, the court announced:

"Since the weekend is here, I will go over the admonition rather carefully.

"Number one, not to talk to each other about the case, your loved ones or your friends.

"Not to make any specific investigations, that includes going to the scene, or any reading, or any extrinsic aspect, in order to keep an open mind and take your evidence from the witness here and handle it in that fashion.

"And with reference to the newspapers and TV, why, try to turn the other way with reference to reading any material or discussing anything of that nature.

"Now, the senior federal judge up here at the Federal District Court used to tell everybody that they were not supposed to do anything physical that would distract them from their responsibilities as jurors, and not to engage in any excesses of any kind. I am not going to tell you that because the sun is out. Have a good time this weekend and we will see you at 9:30 Monday morning."

prejudice has occurred. *Calo v. United States, supra.* In that event the preferred procedure for the court, when the jury is not sequestered, is to question the jurors individually, out of the presence of other jurors, substituting untainted alternate jurors for those regular members of the panel who, the court determines, have been subjected to the prejudicial information. *Commonwealth v. Bruno,* .......... Pa. .........., 352 A.2d 40 (1976). At times the publicity may be so prejudicial and the jury's risk of exposure to it so high that no corrective procedures will suffice to cure the evil wrought. In such case, the court should be guided by the somewhat analogous situation which arises when it is required to rule upon a motion for mistrial because of prosecutorial misconduct. The bell once rung cannot be unrung.

Analyzing the facts in the case at bench, we conclude that the trial court's precautionary measures, together with the presumption that the jury will follow them, were sufficient to reasonably assure Mr. Trickel had a fair trial. The newspaper publicity was isolated, not massive; the headline accompanying the news article was not a banner headline, and it did not herald the material contained in the last three paragraphs of the story; there is no indication that the story was "page one" material or even classifiable as "prominent." See appendix B, *ABA Standards for Fair Trial and Free Press* (Approved Draft, 1968). Additionally, the trial court was not advised of the possible presence of the foreman's girl friend in the courtroom on July 11 until motion for new trial was made long after the jury had been dismissed. In short, we simply do not find that the trial court committed an error of law either in the manner or timing by which it revoked the defendant's bail or in the means employed to prevent the jury from learning of that fact.

We turn next to the defendant's contention that even if the jury found beyond a reasonable doubt that he did commit a homicide, the instructions of the court permitted the jury to elevate that homicide to first-degree murder by presuming the element of premeditation without the neces-

sity of actually finding beyond a reasonable doubt that he did *in fact* deliberate upon a design to kill prior to committing the homicide.

Three instructions are involved. Instruction No. 6 simply restated a portion of the statutory definition of first-degree murder, that

> the killing of a human being, unless it is excusable or justifiable, is murder in the first degree *when committed* with a premeditated *design* to effect the death of the person killed, or of another.

(Italics ours.) Instruction No. 7 told the jury that before it could convict Mr. Trickel of first-degree murder it would have to determine (among other elements of the crime) beyond a reasonable doubt "That the defendant *did* the above mentioned act *with a premeditated design* to effect the death of Carolyn Boggs." (Italics ours.) Finally, instruction No. 8 defined the term "premeditated" as follows:

> The word "premeditated" as used in these instructions means there must be sufficient time to meditate between the formation of the intent to kill and the act of killing.
>
> No particular length of time need elapse before there can be deliberation or premeditation. A single moment may be enough, if there was in fact an intent formed and reflected upon before the act of killing takes place.
>
> *It is sufficient if you find from the evidence and beyond a reasonable doubt that there was a lapse of time, no matter how short, which was sufficient to allow deliberation upon the intent or design to kill.*

(Italics ours.)

Specifically, the defendant objects to the italicized portion of this last instruction. He contends that the court should have added, as his counsel requested at trial, "and that defendant did so deliberate upon a design to kill." Without this curative language, he contends, the instruction allows a juror to infer by the existence of a time period alone that the defendant *did* in fact premeditate and deliberate. Similarly, he contends, the instruction, as given, destroys the distinction between first- and second-degree

murder by overemphasizing time at the expense of determining *actual* intent and premeditation. We disagree.

A somewhat similarly worded instruction was approved in this jurisdiction many years ago. In *State v. Hawkins*, 23 Wash. 289, 63 P. 258 (1900), following conviction of first-degree murder in which sentence of death was imposed, the court approved this simple instruction:

> "No particular length of time need elapse before there can be deliberation or premeditation in an act. A single moment may be enough. It is sufficient if you find from the evidence, and beyond a reasonable doubt, that any length of time elapsed, no matter how short, sufficient to allow a design to be formed in the mind and that design to be deliberated upon and meditated over before carrying into effect."

*State v. Hawkins, supra* at 292-93. We are not unmindful of the fact that the specific error raised herein does not appear, from the face of the opinion, to have been raised in *Hawkins*. More recently, a similarly worded definition of the word "premeditation" was approved in *State v. Tikka*, 8 Wn. App. 736, 509 P.2d 101 (1973), at least when it was accompanied by a definition of the phrase "a premeditated design to kill," neither of which (within the bare bones of the definition) specifically required that the defendant *did* in fact form the premeditated design to kill and did reflect upon that design for a lapse of time, no matter how short.

In the case at bench, the defendant would categorize the first two paragraphs of instruction No. 8 as "definitional" and the last paragraph as "operational." From that analysis, he concludes that the operational portions of the court's instructions failed to require the jury to find that the defendant did in fact actually form the intent and meditate thereon. Again, we disagree.

The "operational" portions of the court's instructions lie not only in the third paragraph of instruction No. 8, but also in those portions of the other two instructions which required the jury, before returning a verdict of guilty to first-degree murder, to find beyond a reasonable doubt that the defendant *did* perform the fatal act *with a premedi-*

*tated design* (intent) to effect the death of Carolyn Boggs.

Further, the defendant directs our attention to *State v. Shirley*, 60 Wn.2d 277, 373 P.2d 777 (1962). In *Shirley*, the court reversed a sentence of death in a first-degree murder case because one sentence of an otherwise appropriate set of instructions improperly defined the term "premeditated." That sentence read, "It is not necessary for an appreciable period of time to elapse for premeditation to exist." The court found that statement to be an *incorrect* statement of the law, "a mistake which eliminated the distinction between first and second degree murder". *State v. Shirley, supra* at 279-80.

In the case at bench, the defendant challenges the validity of the instruction because of its incompleteness, not its specific incorrectness. We do not find the instructions, taken as a whole, either incomplete or confusing. A jury is not an unsophisticated body of people. *State v. Berkins*, 2 Wn. App. 910, 471 P.2d 131 (1970). The jury was correctly advised of what it must determine before it could find the defendant guilty of first-degree murder. We find no error in the court's instructions.

Next, the defendant contends the trial court unreasonably restricted the number of character witnesses who could be called on his behalf. Actually, five witnesses testified that the defendant's reputation for truth and veracity in the community was either "good" or "excellent." Others were asked, but indicated that they did not know the defendant's reputation for truth and veracity. The number of character witnesses was ample. We find no error.

Finally, the defendant contends he was denied the right to present evidence of Donald Boggs' reputation in the community for truth and veracity. This issue arose in a somewhat isolated fashion on redirect examination of the defendant's mother. She was asked whether or not she was familiar with the reputation of Donald Boggs for truthfulness in the community where he resides. A blanket objection was sustained, and the issue was never again raised at trial. No offer of proof was ever made that the witness was

34

familiar with Boggs' reputation, and the question was certainly not asked to elicit an explanation of or to clarify any matter brought out on cross-examination. If the question had been asked at an appropriate time the trial court would have committed serious error by sustaining an objection upon presentation of an appropriate offer of proof. Under the circumstances by which the issue was raised, however, we find no reversible error.

Judgment affirmed.

PEARSON and REED, JJ., concur.

Petition for rehearing denied September 16, 1976.

Review denied by Supreme Court February 23, 1977.