[No. 40212.    Department Two.    August 14, 1969.]

THE STATE OF WASHINGTON, *Respondent,* v. TOMMY EDWARD BASFORD *et al., Appellants.*\*

*Perry J. Robinson,* for appellants (appointed counsel for appeal).

*Lincoln E. Shropshire* and *Patrick H. Olwell,* for respondent.

HALE, J.—Ruby Ennis had a pretty good idea who tied

\*Reported in 457 P.2d 1010.

her up and robbed her on the night of January 29, 1967. In court, she said that she recognized the voice of one of them, and everything else in her mind added up.

The prosecuting attorney charged Tommy Edward Basford and Donald Charles Basford with the crime, a jury found them guilty, and they appeal. They challenge the sufficiency of the evidence and claim reversible misconduct on the part of the prosecuting attorney in arguing to the jury.

After her husband died in September, Ruby Ennis stayed on to run the combination cafe, service station and store at Pond, Star Route, Naches, about 35 miles from Yakima on the Chinook Pass Highway. She took care of the business and Connie Basford, a cousin of defendants, helped her. It was about 9 at night, she said, and Connie had gone to town but was due back about then to watch a television show with her. Connie was living in Mrs. Ennis' house, but had bought a place of her own down the road where she stayed once in a while.

As Mrs. Ennis testified, she had a headache and decided to close up early. She locked the cafe and other parts of the premises and, with her purse on her arm and an Almond Joy candy box containing nearly $4,000 in her hand, started to walk the few steps from the back of the store to her house. Although the night was dark, she said that the area was quite light because of a yard light by a nearby telephone booth, a banjo sign light and a backyard light on the station. She described what happened:

A. I walked to the house and was just at the foot of the steps which is two little steps that go up on the porch and having a headache I wasn't looking around very much and pretty soon I heard a little rustle and when I did I looked up at the corner of the house and I was looking right down the muzzle of this gun. Q. What kind of gun? A. It was a pistol of some sort; had a long barrel on it. I stood there and didn't move at all for several minutes or didn't say anything until he says, "This is a stickup. Where's the keys to the pickup?" This was a pickup that was sitting outside my curb of the lawn and I said, "I'm sorry, boys, I don't have the key to that

pickup because it doesn't belong to me. It belongs to a neighbor up on the hill." So I reached in my pocket to get the key to the house, being winter time you didn't tarry outdoors very long and he said, "Whoops, wait a minute, where's your gun?" So, O.K., they knew I had a gun. My mind started working and he immediately walked right behind me when I took the keys again and put them in the door lock and he walked immediately behind me and stuck that revolver right in my forehead and he kept it there for—well, it must have been almost a half-hour. When I opened the door he give me a shove and shoved me inside the door. I took my elbow like this and flipped the light switch as he shoved me inside the door and to my disadvantage the light bulb was burned out. I had lost again.

So I made a move to reach my table light and he said, "No, no lights," so I flipped the switch back off that was of no use now and he give me a shove again and told me to get on my knees on the chair. I said I had a stiff knee and I couldn't get down and he said, "I said get down," and so he pulled off my glasses and throwed them away. I begged for the glasses back and he said, "O.K., on second thought you can get up," and so he gave me a shove into the bedroom and he said, "We will check here. Where's this other box of money?" And I said, "Do you suppose I have big boxes of money sitting around on the floor?" and he shoved me into the bedroom, and he said, "O.K., we'll look." I had just housecleaned. He pushed the clothes aside in the closet. There was nothing but a suitcase and a little box down on the floor that held the air conditioner, and so he reached up and he gets this purse, saw it laying there, and shook it and then he seemed to be alarmed of the fact that I might get away or something. I'll admit I was trying to give him a bad time because I wasn't wanting to part with any money and I was really thinking, so much so that I wasn't thinking probably along far enough lines or something, but anyway he shoved me back into the front room again and he said, "You get on the daveno. We are going to tie you up," so I sat down on the daveno and he said, "Oh, no, if you give me any more trouble, I'm going to pull this trigger," and so I laid down on the daveno on my face. About that time I heard a knock on my back wall —a knock on my back door, the back wall was over here. Q. What do you mean by "over here," now? A. It was in the back of the building next to the hill. You see, the

house sits real close to the hill. On that back wall I heard a knock. Around here and on this side is my back door and I heard a knock there also, so I thinks, "Whoops, more than one." To that time there had been only one. He opens the door, lets this other fellow in and says, "Get something and tie her," and this one says, "Where's the money, where's the box of money?" He says, "Over there in the chair." So he gets this turkish towel and around and around. No, if I had been a real excitable person I could have choked to death right there because they tied my hands behind me, tied my feet and they took the money.

She said she had seen the two defendants "two or three or four different times" before the robbery when they had come to her place and bought gasoline and to see their cousin Connie, and heard that, after buying gas at her place last time, they had been picked up by law officers for poaching.

She said that the two men were in her house during the robbery for about one-half hour; she got a good look at the first man's clothes, estimated his age at somewhere around 22 or 23, but never got a chance to see his face because he told her if she turned her head he would pull the trigger. She said she recognized the voice of the one who held the gun on her and pointed him out in court as defendant Donald Basford.

She testified that the men who robbed her took everything out of her dresser drawers, threw the contents on the bed and all over the room. Ordinarily, she kept the money in a safe in her house. This particular night the money in the candy box came to about $3,600 in cash and $400 in checks and Mrs. Ennis was moving it from the store to her safe in the house.

On cross-examination, she said the robber who was doing the talking asked where she kept the big box of money and she answered, referring to the money in the Almond Joy candy box, "That's the only money I've got right there and if you're smart, you'll take it and get out of here because somebody's going to catch you," and he said that "if I kept messing around he was going to pull the trigger."

Mrs. Ennis slid the money box under a swing rocker, and when the other man came into the room they had a conversation concerning its location and the possibility that she had other money hidden in the house. From the record one could easily infer that she had good opportunity to hear one of the men talk and a lesser opportunity to listen to the other one. She said the first one had on a pulled-down stocking cap so she did not get a good look at his face because, he said, "Don't turn your head or we'll pull the trigger." She heard but did not see the other one because the first one had tied her up and wrapped a Turkish towel around her head so tightly it choked her, and the second man did not enter there until "after I had my head plunked down on the daveno and took something and tied me up and wrapped a turkish towel around my head to choke to death."

A deputy sheriff testified that he questioned Mrs. Ennis shortly after the robbery and that Mrs. Ennis said she thought two of the men were Basfords. On cross-examination, Mrs. Ennis said that she thought she recognized the voice of one of them because two of the Basfords had bought gas there the day before.

Connie Basford Burchett (married since the robbery) and first cousin to the two defendants, said that she started working for Mrs. Ennis at the Pond Cafe in June, 1966, and stayed at her house off and on. She testified that she worked that morning of January 29, 1967, at the Pond Cafe and remained there until 7 p.m. when she went into town with the understanding that she would return by 9 p.m. to watch television with Ruby Ennis.

She had seen Mrs. Ennis carry money in the candy box many times, she said, from the store to the house. Connie Basford Burchett did return to the Pond Cafe at about 9:05 or 9:10, but seeing that all the lights were off assumed that Ruby Ennis was not at home so she returned to her own house. She then testified that around 9:30 or 10 o'clock, that same night, her Aunt Myrtle, mother of defendant Thomas Basford, and Tommy's wife came in for a visit. They were driving an old Buick station wagon. The two

visitors stayed until midnight. She thought it a strange visit because neither her Aunt Myrtle nor Tommy's wife had visited her house before, and she had not seen either of them since the preceding June. Their announced purpose of calling seemed curious to her also, for they came to deliver a misdirected letter which, from the appearance of the envelope, contained nothing more than an advertisement for books.

Deputy Sheriff Thompson testified that he went to the Pond Cafe to investigate the robbery about 9:30 the next morning, January 30, and talked to Mrs. Ennis. He looked for fingerprints, but found only unclassifiable smudges. At the back of the house, he found three sets of footprints leading up the hill away from the house, as he described it, "Yes, we went up on the hill. Of course the snow was pretty well melted off the south side of the hill and when the foot prints got up on the hill far enough they got into the rocks and we lost them." The tracks were distinct and he could follow them to the back of the Ennis house and away from it. He found three beer cans "sitting in the snow" with no snow on them close to Connie Basford's house.

The tracks, possible routes taken, and time sequences involved were altogether consistent with someone driving the defendants to the vicinity of Connie Basford's house, and their then leaving the road and hiking overland up into and down a steep area for 2 hours, committing the robbery and returning to the vicinity of Connie Basford's house. Also a timetable of events concerning the search for the robbers permitted an inference that, had this been done, the peace officers would not have apprehended the get-away car at the roadblocks.

There was, however, more direct and convincing evidence of guilt. Before the robbery, defendants had asked one of their cousins to join them in it, and later they told him they had committed it. Harold Basford, called by the state in chief, referring to the defendants, testified:

Q. What do you know about the robbery at the Pond Cafe? A. Well, I know that they said they was going

to—wanted me to go with them. I wouldn't do it. I think they would have sense enough—anybody would have sense enough not to do a trick like that. Q. Who wanted you to go with them? A. Don and Tommy. Q. Don and Tommy who? A. Basford. Q. Here in court today? A. Yes, sir. Q. Are they your first cousins? A. Yes, sir.

According to his testimony, they were laughing about it when they read an account of the robbery which had appeared in the newspaper:

A. ——And I went back over the next following day and all that came out in the paper and they was laughing about it. Q. Who was laughing about it? A. Tommy was. Q. What was he laughing about? A. About this here woman—how gentle she says the three guys was that tied her up. Q. Did they ever make any admissions to you as to who did this? . . . Q. How many times did you talk to Donny and Tommy about this? A. Oh, I guess they mentioned it about three or four times. Q. What specifically did they tell you? A. Oh, they told me that —— . . . Oh, Tommy told me they had nylon socks over their heads. . . . Q. They had a nylon sock stretched over their head with eye-holes stretched in it. Q. Did they say anything else? A. Yeah, they said that the money was in a little tin box that they got between the filling station and the house. Q. In a little tin box that they what? A. That had the money in it. Q. Now, what did you say, you said—between—you said something about the house and the —— A. ——They got it where you come out of the cafe towards the house. Q. Who told you this? A. Tommy. Q. Was Donny there at that time? A. Yeah. Q. Did Donny ever tell you anything about this? A. I asked him when I got out of jail here —— . . . A. Why didn't Tommy and him try to get me a lawyer and he said Tommy had all the money. Q. Donald told you that Tommy had all the money? A. Yeah. Q. Do you know how much money was involved? A. About $3700. Q. Who told you this? A. Tommy. Q. Who did Tommy say was up there? A. There was three of them, Bob Schrier and my two cousins. Q. Two cousins by whom? A. Tommy and Donny.

He testified that they told him they got $3,700 from the robbery and he knew they used it to buy "Quite a lot of

stuff." Among the "stuff" he knew they bought with the stolen money was a truck and hogs, some fighting chickens at around $20 or $25 each, clothing, hats, boots and a walkie-talkie set. They also made a down payment on a 1959 Chevrolet and paid off a $250 bail bond on an elk poaching charge for an alleged accomplice. He repeated on direct examination his testimony that, before they committed the robbery, they had asked him to go along on the enterprise with them:

> Q. You said first of all, Harold, that Tommy and Donny ask you to go with them? A. Yeah. Q. How long before this did they ask you to go with them? A. I don't originally know because I never kept track of the date. Q. Do you remember what they specifically said in reference to wanting you to go, what did they say to you? A. They said that the woman had some money that would be easy got. I told them I wasn't that foolish because I might have got drunk one time and made a foolish mistake, but I paid for it. Q. Do you know where this Pond Cafe is? A. It's up White Pass, ain't it?

On cross-examination, Harold Basford testified that he had not reported to the sheriff his knowledge of the robbery until July, 1967—about 6 months after it occurred. His report to the law, he said, was prompted by an incident when he and the defendants were at a swimming hole and he had accidentally hit their little brother Stevie in the head with a rock. The two defendants came to his place afterwards and "beat up" on him:

> A. Well, it all started when we was out at the swimming hole. We was throwing rocks and everything. I throwed one over and cracked the least one in the head. I offered to take him to the doctor and the hospital and everything. They wouldn't accept it. Q. Then what happened? A. So I went over to where Tommy and Donny was and they gave me the same dose that Stevie got. Q. What do you mean? A. Busted my head; cut the side of it open; busted my eardrum open.

Next day, as he candidly put it, he reported the crime to the sheriff to get even with them because he had told the boys he was going to get even with them. He said that the

Basford brothers had only one car before the robbery—a 1961 Buick Special station wagon.

George King, a deputy sheriff, testified that sometime after 9 o'clock at night his office received word about an armed robbery, sent an officer to talk to the victim, and set up a roadblock which they maintained until 12:45 a.m. He said that they suspected the Basfords—for reasons he did not state—and checked them. He sent officers to the Basford's house at 12:30 a.m. of the 30th; the lights were off and there were no vehicles there. They checked the Basford residence at 1:30 a.m., and again at 2:36, observed the lights on in the house, but saw no vehicles. At 3:15 a.m., although the lights were still on in the Basford house, they found parked there a 1961 Buick 4-door station wagon registered to defendant, Tommy Basford.

There was evidence, too, that the defendants had been arrested for out-of-season elk hunting in the hill country near the Pond Cafe before the robbery.

■ The defendants assign error to the court's refusal to dismiss or grant arrest of judgment or a new trial because of insufficiency of the evidence. This assignment appears untenable, because, as the summary of evidence shows, there was substantial evidence, and reasonable inferences to be derived therefrom, to take the case to the jury. It is the jury and not the court which decides questions of fact. If substantial evidence from a competent source has been presented to prove the existence of each element of the offense and the accused's commission of it, then the court is without discretion to take the case from the jury. In evaluating whether the evidence is substantial, the court must, as we said in *State v. Zorich,* 72 Wn.2d 31, 431 P.2d 584 (1967), view the evidence "most strongly against the moving party and in the light most favorable to the opposing party, and whether the evidence is sufficient to submit the issue to the jury is a question of law for the court and no element of discretion is involved." *State v. McDonald,* 74 Wn.2d 141, 443 P.2d 651 (1968).

■ It is, of course, a basic principle of law—perhaps even antedating the adoption of the federal constitution—that

the jury is the sole and exclusive judge of the evidence, and if its verdict is supported by substantial competent evidence the verdict shall be held good. *State v. Davis*, 53 Wn.2d 387, 333 P.2d 1089 (1959), *cert. denied*, 359 U.S. 981, 3 L. Ed. 2d 930, 79 S. Ct. 902 (1959); *State v. Mickens*, 61 Wn.2d 83, 377 P.2d 240 (1962). Given substantial evidence and all favorable inferences derivable from it to support the verdict, the court on review is not free to weigh the evidence and decide whether it preponderates in favor of the verdict, regardless of how the court on review might have resolved the issues of fact. *State v. Baxter*, 16 Wn.2d 246, 132 P.2d 1022 (1943).

■ Defendants assign error to certain remarks made by the prosecuting attorney during argument to the jury. They took no exceptions or objections to the remarks, nor made any remedial motions. Improper argument at trial cannot be held error on review unless the aggrieved party has requested the trial court to correct the error by instructing the jury to disregard it and has taken exception to the court's refusal to do so. *State v. Case*, 49 Wn.2d 66, 298 P.2d 500 (1956); *State v. Morris*, 70 Wn.2d 27, 422 P.2d 27 (1966); *State v. Franks*, 74 Wn.2d 413, 445 P.2d 200 (1968); and *State v. Hames*, 74 Wn.2d 721, 446 P.2d 344 (1968).

The failure to preserve adequately the record of error is excused only when the misconduct is so flagrant that no instructions could cure it. The record, in our opinion, clearly discloses that the remarks could not be deemed so flagrant and prejudicial as to be incurable by instruction from the court.

We have considered the other assignments of error and, finding them to be without merit, affirm the judgment.

HUNTER, C. J., ROSELLINI and NEILL, JJ., concur.

HILL, J. (concurring)—I am writing a short concurrence because the manner in which the majority handles the failure to make objections to the improper arguments of the prosecutor fails to give any guidelines to prosecutors,

and to the bar generally, as to what we regard as being or not being "so flagrant and prejudicial as to be incurable by instruction from the court."

Our holding, to be of any assistance to the bar or to have any precedental value, should quote or paraphrase the language used.

The prosecutor in his opening argument after conceding with relation to the evidence that "it's not an awful lot" called attention of the jury to the suspicious circumstances such as the sheriff's officer who testified "These guys were suspects as soon as they got the call."

Passing the matter of the attempt to bolster the evidence with suspicions, it is evident that the prosecutor put the weight of his knowledge of the facts onto the scales in his concluding statement—"if you don't convict these two, you've made a very serious mistake."

Conceding that statements made were improper and prejudicial, I agree with the majority that the error could have been and would have been corrected had the trial court been requested to do so by an instruction to disregard the statements of the prosecutor. Defense counsel was aware of his remedy, and had objected to the prosecutor's statement "He (referring to defense counsel) says these other three boys weren't checked out. As a matter of fact they were and we found they weren't in the area at this time."

The trial court sustained the objection to that statement, and instructed the jury to disregard it.

The failure of defense counsel to object to the statements now claimed on appeal to be improper and prejudicial may have been a matter of trial strategy (counsel must choose between being strategists and preserving their records). No objection was made to these statements at the trial, and I agree with the majority that the claimed error could have been corrected, and "was not so flagrant and prejudicial as to be incurable by instruction from the court."

----

October 8, 1969, Petition for rehearing denied.