[No. 1386-2.   Division Two.   November 13, 1975.]

THE STATE OF WASHINGTON, *Respondent,* v. CALVIN CHARLES DARNELL, *Appellant.*

*Robert Felker,* for appellant (appointed counsel for appeal).

*Donald F. Herron, Prosecuting Attorney, Michael R. Johnson, Deputy,* and *Joseph D. Mladinov, Special Counsel,* for respondent.

Pearson, J.—Defendant Calvin Charles Darnell appeals his conviction by a Pierce County jury for armed robbery. His sole contention on appeal is that he was denied a fair trial because of certain tactics and alleged misconduct of his counsel.[1] Defense counsel was originally retained by defendant but later, upon a showing of indigency, was appointed by the court.

The question raised is whether defendant was denied effective assistance of counsel as required by the sixth amendment to the United States Constitution. *Powell v. Alabama*, 287 U.S. 45, 77 L. Ed. 158, 53 S. Ct. 55, 84 A.L.R. 527 (1932).

These are the specific matters alleged in support of the claim that counsel provided ineffective representation.

1. Counsel failed to make any real objection to any evidence introduced by the prosecution, and in particular counsel failed to object to the use of a witness whose name was not on the list of witnesses furnished by the prosecution prior to the trial.

2. Counsel complimented the State's fingerprint expert witness at the conclusion of his cross-examination.

3. Counsel was "curt" with defendant while he was testifying in his own behalf.

4. Counsel introduced inflammatory, prejudicial, and irrelevant testimony concerning defendant's prior criminal record, including prison time he had previously served, suspended sentences, probation revocations, and defendant's entire FBI "blow back."

5. Counsel asked "Do you have any vocation other than stealing?"

These charges, taken totally out of context and without any reference to the strategies of the defense, seem serious. However, a review of the evidence and of the context of the alleged misconduct, and a consideration of those strat-

---

[1]Defendant was represented by an attorney who has been a member of the Washington State Bar Association since 1939, was elected prosecuting attorney for Pierce County and served in that capacity for one 4-year term.

egies will dispel any notion that defendant received inadequate or ineffective representation.

The charges against defendant stemmed from an armed robbery which occurred at 12:45 p.m. on January 3, 1974, at the Lucky food store at 6th and Pearl Streets in Tacoma. A lone Black male entered the store office and confronted the assistant manager, Richard Rehn, with a package, partially covered with a brown paper bag, which he stated contained a gun. Under duress, Rehn gave the robber $425 from an office safe. The robber exited hastily by forcing outward a door designed to automatically open inward. As the robber ran from the store, he was observed by a bread truck driver, Nick Tomanelli, who had just arrived at the store's parking lot. Tomanelli saw a Black man run out the door of the store toward a bright yellow Volkswagen with a black racing stripe painted just below the window line, which was parked by itself in the parking lot. He observed the suspect throw a bag into the car, jump in, discard his hat, and quickly drive away. Tomanelli saw no other person in the Volkswagen. This witness noted that the license number of the Volkswagen began with a B or D and had the numbers 7, 6, and possibly 0.

Rehn immediately phoned the police and described the robber as a Negro male about 25, with short hair, a brown suede coat, a brown flat cap with a small bill, wearing yellow sunglasses, and carrying a package partially covered with a brown paper bag. Rehn had observed that from one end of the bag was protruding some red and white material and some foam. Tomanelli furnished police with a description of the vehicle.

Approximately 10 minutes later a Tacoma police officer observed a vehicle matching the description given by Tomanelli near the intersection of South 15th and M Streets in Tacoma, some 5 miles from the scene of the robbery. The sole occupant of that vehicle was Black. The vehicle, a yellow Volkswagen with a black racing stripe, bore the license number DKN 760. Officer McPhail stopped the vehicle at South 15th and L Streets and arrested defendant

on suspicion of armed robbery. An impoundment search of the vehicle disclosed a hat, a wig, yellow sunglasses, and two jackets, including one made from a brown suede material. On the front seat of the car the police discovered a brown paper bag. Inside the bag was a small red and white package which contained a gun, partially concealed in styrofoam. The glove compartment contained $325.15, in denominations and packets similar to those taken from the safe. A search of defendant's person disclosed a package of five $20 bills, also similar in denomination and packaging to those taken from the safe.

Another witness, Joan Tomanelli, described an incident which had occurred in the Lucky store about 30 minutes prior to the robbery. She was employed at the check stand when a Black man wearing a brown suede coat, a brown hat, and yellow sunglasses approached her and asked if he could have a brown paper bag. She obliged. She noticed that he was wearing green shoes with platform soles. Similar shoes were also found in defendant's automobile.

Suffice it to say that all witnesses who were in contact with the robber could not make a positive identification of the defendant. However, they all testified that he was similar in appearance to the robber. Likewise, items taken from defendant's car including the jacket, hat, sunglasses, wig, shoes, and paper sack were identified as similar to those used or worn by the robber. Defendant's fingerprint was identified from a latent print found on the brown bag.

Defendant's alibi, wholly unsupported by any evidence, circumstantial or otherwise, was that he had come to Tacoma from Seattle to locate a business prospect who resided at the College Lakes Apartments. He admitted he had stopped at the Lucky store on the way to the College Lakes Apartments to obtain a brown paper bag so he could clean up his car. He thus confirmed that he was in the Lucky store some 30 minutes prior to the robbery. After an unsuccessful attempt to locate the party at the College Lakes Apartments, defendant testified he picked up a Black hitchhiker and agreed to drive him to Seattle. The hitchhiker

asked defendant to stop at the Lucky store for cigarettes. Upon his return they proceeded toward downtown Tacoma. Shortly before the police stopped the car, the passenger had hastily exited the vehicle, leaving behind the money and the package containing the gun, together with the other items of apparel described by the victim. This exit from the Volkswagen was triggered when the passenger observed the police vehicle.

While carefully tailored to the facts, this alibi had one rather glaring defect. Neither Tomanelli nor Officer Mc-Phail had observed any person in the suspect vehicle except the defendant.

■ We now turn to defendant's claim that he was denied effective assistance of counsel contrary to his constitutional rights. It is axiomatic that under both the state and federal constitutions an accused is entitled to reasonably competent and effective counsel. *State v. Queen*, 73 Wn.2d 706, 440 P.2d 461 (1968). However, the effectiveness of counsel cannot be measured by the result obtained. The test is: Does the record, as a whole, show the accused was accorded an effective representation and a fair and impartial trial? *State v. Johnson*, 74 Wn.2d 567, 445 P.2d 726 (1968).

■ At the outset it must also be stated that the facts and circumstances surrounding a crime place definite limits on what counsel may ethically do on behalf of the defendant. If, for example, evidence of guilt is overwhelming, counsel may be limited to a careful monitoring of the prosecution's case, to assure that only admissible evidence is received and proper instructions given to the jury to insure that his client receives due process of law. His role in argument may very well be limited to a discussion of the evidence in light of the state's burden of proof, *i.e.*, to prove guilt beyond a reasonable doubt. *See State v. Queen, supra.*

With these general rules in mind, we turn to the first argument defendant makes in support of the claim of ineffective representation, namely, that counsel failed to make

any real objections to any evidence introduced by the prosecution.

Except in one particular, defendant points to no specific instances in which defense counsel might have successfully presented an objection to the prosecution's evidence. Our review of the record furnishes the reason. The deputy prosecuting attorney was well prepared. The witnesses were interrogated properly and with dispatch. It would have been useless to object except in those instances in which objections were in fact made. There is, we think, a prevailing misconception concerning the role of defense counsel in a criminal case, namely, that he is not effective if he fails to interpose frequent objections to evidence, even though the objections have no basis in law. Not only do such tactics usually work to the disadvantage of the client, but they also lower the standards of the profession and bring disrepute upon the court itself. *See* (CPR) DR 7-102(A)(1), (2), (4), and (5); (CPR) DR 7-106(C)(6); *State v. Lei*, 59 Wn.2d 1, 365 P.2d 609 (1961).

In this regard the following statement is most appropriate.

[P]artisan advocacy is a form of public service so long as it aids the process of adjudication; it ceases to be when it hinders that process, when it misleads, distorts and obfuscates, when it renders the task of the deciding tribunal not easier, but more difficult.

*Professional Responsibilities: Report of the Joint Conference*, 44 A.B.A.J. 1159, 1162 (1958). Nor does effective trial advocacy always require counsel to make an objection which is technically well taken in those instances where the evidence sought to be introduced does not adversely affect the defense. On the contrary, the strategy of the defense may, under certain circumstances, dictate that counsel refrain from making the technically correct objection. On this basis we think counsel for the defense was warranted in refraining from interposing an objection to the testimony of Officer McCoy, whose name did not appear on the list of witnesses furnished by the prosecution prior to the trial. *See* CrR 4.7(a)(1)(i).

Officer McCoy was one of several officers who arrived at the scene of defendant's arrest and inspected the Volkswagen and its contents. His testimony consisted of a description of the vehicle and its contents. Other officers had testified to these matters and in this respect McCoy's testimony was merely cumulative. More important, however, defendant's alibi did not conflict with the testimony presented by McCoy. In fact, belief of his alibi required the jury to accept the prosecution's premise that the car contained the stolen money and other items worn or used by the robber.

Accordingly, benefits from the objection were minimal. Unquestionably, counsel for the defense believed the jury would be more inclined to accept defendant's alibi if the trial were relatively free of technical objections not touching the merits of the defense. This is proper rather than improper trial strategy. *See State v. Aleck*, 10 Wn. App. 796, 520 P.2d 645 (1974).

The next complaint concerns defense counsel's compliment made to the state fingerprint expert. The compliment was made to Sergeant Theodore Wakefield at the conclusion of his cross-examination: "I think that's—you're excellent, thank you very kindly."

The context of this statement is important. Wakefield was highly qualified and articulate. On direct examination, he had meticulously identified 11 similar characteristics between the latent print taken from the brown paper bag and defendant's own print, and concluded that defendant's print was on the paper bag. His testimony was virtually unassailable, and defense counsel did not attempt to undermine it on cross-examination. However, immediately prior to the compliment, counsel elicited an admission from the expert that even though the police could have developed latent prints from the money recovered or from the interior of the car, the only latent print turned over to Officer Wakefield was the one print from the brown paper bag. This was an important admission, helpful to the defense. Not only did it suggest a careless investigation by the police, it also left

room for a legitimate argument supportive of the alibi. Specifically, the police had not ruled out, as they might have, the presence of the hitchhiker who, under the defense theory, had perpetrated the crime. Furthermore, the expert had not damaged the alibi. Defendant admitted that he handled the paper bag after this passenger exited the car. The compliment read in this context was helpful, rather than harmful, to the defense.

The next charge against defense counsel was that he was "curt" with his client and refused to give him proper assistance while testifying. The instance of alleged misconduct occurred while defendant was giving the following exculpatory explanation of his conduct:

> [I]f I had of pulled a robbery, would I have headed towards the police station? I didn't know my way around this town, nor more than just pull a robbery and head up three or four blocks, 15th and L is a couple of blocks up the hill or M, or whatever it is, am I correct? Is that where it's at? Q [By defense counsel] I suppose, I don't know, I wasn't there.

The only other instances in which counsel in any way admonished the defendant was an occasional request that he "speak up" so the jury could hear his testimony.

In our view, no misconduct was evidenced by defense counsel in this record. We are cited to no authority which would require defense counsel to supply information to the defendant to assist his testimony. Such conduct would be objectionable as improper coaching, and might suggest to the jury that the alibi was contrived with the aid of counsel.

Furthermore, we know of no more serious dilemma facing the criminal defense counsel than when he is confronted with the responsibility of questioning his client on the witness stand about a questionable alibi. Here, a defense attorney walks a tightrope between his responsibilities to his client to furnish zealous representation and his duty to the court and the judicial system not to participate in an attempted deception. In our view, counsel walked that tight-

rope ably in this case, within the highest traditions of the legal profession. Zeal in representation of a client must always be exercised within the bounds of the law. (CPR) Canon 7, (CPR) DR 7-101 and -102. It was in this case.

We next turn to the assertion that defense counsel brought before the jury inflammatory and inadmissible matters concerning defendant's prior criminal record. It is true that counsel brought out many things about defendant's record that the State would not have been able to bring out for impeachment purposes. Those included defendant's arrest record, as well as details about his sentencing and prison record which may not be allowed as proper impeachment. *See State v. Chisholm,* 4 Wn. App. 29, 479 P.2d 164 (1971); *State v. Harrison,* 72 Wn.2d 737, 435 P.2d 547 (1967).

However, the purpose of bringing forth these matters becomes obvious when we consider one phase of defendant's alibi. After relating to the jury his alibi, defendant attempted to persuade the jury as to the truth of his testimony by showing that while he had been in numerous clashes with the law none previously had involved a gun or an armed robbery. The thrust of this argument came from defendant's testimony:

> Now, pistols I know automatically for a parole violator, it's a flat five years, no parole, it's nothing, it's five year's time. It's true in the past I have hustled, there's no doubt about it, it shows in my record, but *guns aren't my mark* . . .

(Italics ours.) Defendant thus said to the jury, in effect, "Believe my story about the hitchhiker because guns have not been involved in any of my prior criminal record, and as a parolee, why would I resort to an act which would result in a mandatory 5-year sentence by using a gun in this instance."

Defendant's prior record bore out this argument. It showed that he was on parole. It showed arrests for petty theft, credit card theft, and shoplifting, as well as the two

convictions for grand larceny. The prior record was obviously a part of the defendant's trial strategy.

■ Counsel's question as to whether defendant had any vocation other than "stealing" likewise emphasized the distinction between the present charge of armed robbery and the nonviolent nature of defendant's past criminal involvement. Furthermore, it provided a more or less humorous transition to defendant's legitimate business pursuits, which he wanted the jury to give attention following the testimony concerning his illicit activities. No one can say the statement effectively accomplished this transition. It was perhaps unwise. But the use of humor to make a point or relieve the tension of the trial is an accepted trial tactic. It is a simple matter to condemn counsel in retrospect for making this statement and from a cold record it seems a dubious tactic. However, each counsel's own personality dictates the strategy he uses. How one warms his client to the jury or gets them to listen sympathetically to his testimony will vary among competent counsel, and with the personality of the defendant. *State v. Roberts*, 69 Wn.2d 921, 421 P.2d 1014 (1966).

We are unwilling to assume that this statement constituted serious misconduct even though this question is highly improper where it comes from the prosecuting attorney. *State v. Green*, 71 Wn.2d 372, 428 P.2d 540 (1967).

By reason of our disposition of the above issues, it is unnecessary to consider defendant's final contention that the trial court should have instructed the jury against the alleged misconduct by cautionary instructions.

From our view of the entire record, we conclude that defendant received able and competent representation, as well as a fair trial.

Affirmed.

PETRIE, C.J., and REED, J., concur.

Petition for rehearing denied December 18, 1975.