[No. 3943–II. Division Two. June 30, 1981.]

THE STATE OF WASHINGTON, *Respondent,* v. WILLIAM DUANE PEYTON, ET AL, *Appellants.*

---

*David D. Gordon, Charles Herrmann, Steven L. Larson, Robert Felker, Gregory Abel, Robert G. Grey,* and *Moe Birnbaum,* for appellants.

*Don Herron, Prosecuting Attorney,* and *Joseph D. Mladinov, Senior Deputy,* for respondent.

PETRIE, J.—James Malone a/k/a James Mathis, Clifford Johnson, Walter Mathis, William Duane Peyton, Bryce Monds, Willie Moore, and Debra Sue Cartwright were all convicted of first degree murder and first degree robbery. Both charges arose out of the robbery of a bank in the Parkland area of Tacoma on October 6, 1978 and the killing of a deputy sheriff who was in hot pursuit of several of them in flight from the bank. All defendants raise some common issues, and other issues are argued by one or more but not all of the defendants. We affirm the convictions; the assignments of error have been grouped together in five general headings in this opinion.

The background facts, some of which were testified to by Albert "Buck" Harmon, a codefendant who pleaded guilty before trial to robbery and second degree murder, present a tragic picture. The bank robbery was planned extensively. Six of the defendants (Peyton, Monds, Johnson, Moore, Cartwright, and Harmon) entered the bank wearing ski masks, some of them carrying guns. They took approximately $44,000 in cash and fled in a van driven by Harmon. Walter Mathis, who was coordinating the robbery by two–way radio, and Malone were parked nearby in other vehicles. They also left the scene when the others fled. Mathis went home. Malone followed the van to a prearranged location where the van was abandoned. Four of the occupants got into a waiting getaway car, a Bobcat station wagon, and two of them joined Malone in his car. Washington State

Patrol Trooper Richard Krook took up pursuit of the Bobcat and was fired upon. The Bobcat came to a stop and all four occupants (Peyton, Johnson, Monds, and Moore) jumped out and began running across the nearby fields. Pierce County Deputy Sheriff Kenneth Moran joined Trooper Krook and gave chase on foot to the robbery suspects while Krook tried to get some onlookers in the area to take cover. Shots rang out in the field, killing Moran. The State's theory of the case was that Peyton fired the fatal shot, but all defendants besides Harmon were tried jointly and were convicted upon the felony–murder doctrine. RCW 9A.32.030(1)(c).

### PRETRIAL RULINGS AND ACTIVITIES

We first consider the contention that a change of venue should have been granted due to the pretrial publicity given this case. We advert to the factors set forth in *State v. Crudup*, 11 Wn. App. 583, 587, 524 P.2d 479 (1974):

(1) the inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn.

News media gave the bank robbery, murder of Deputy Moran, and Moran's funeral extensive coverage over a 1–week period some 3 months prior to jury selection. Newspaper coverage included large photographs of the "manhunt" that occurred in the semi–rural area of the shooting and of the mourners at the funeral. We have reviewed the record to determine if a reasonable probability of juror prejudice was present at the time of trial, in order to decide whether the trial court abused its discretion by

denying a change of venue. *State v. Jamison,* 25 Wn. App. 68, 604 P.2d 1017 (1979); *State v. Haynes,* 16 Wn. App. 778, 559 P.2d 583 (1977). Rather than unduly protracting this opinion by a point–by–point discussion of the *Crudup* factors, suffice it to say that none of them individually or collectively lead us to conclude that a change of venue should have been granted. Many of the jurors had read "something" about the case, but generally their recollections were vague. Only 1 venireman of 86 recalled that two of the defendants had prior criminal records, and he was removed by the court. The defense team accepted the jury and utilized only 17 of 21 peremptory challenges. The record clearly indicates the trial judge's concern that an impartial jury be impaneled, which the court took steps to effectuate by conducting the examination of each juror in isolation from the panel. A change of venue was not necessary.

Defendants Peyton and Mathis argue that they did not knowingly waive their right to speedy trial because their counsel allegedly was not present at the hearing on November 21, 1978 when the speedy trial right was waived. The record shows this contention to be frivolous. Each of them was present with his attorney when the waivers were executed and the trial date was continued.

Mathis also argues that because his arrest was based on the unlawful confession of Clifford Johnson, the police did not have probable cause to arrest him and this somehow impacts his conviction. We disagree. We recognize that the exclusionary rule may limit the proof offered at trial, but the illegality of a defendant's detention cannot deprive the prosecution of the opportunity of proving guilt by the introduction of evidence wholly untainted by police misconduct. *United States v. Crews,* 445 U.S. 463, 63 L. Ed. 2d 537, 100 S. Ct. 1244 (1980). An illegal arrest or detention does not void a subsequent conviction otherwise valid. *Gerstein v. Pugh,* 420 U.S. 103, 43 L. Ed. 2d 54, 95 S. Ct. 854 (1975).

Several defendants moved for separate trials because

they feared guilt would be imputed to them by association and that codefendants' statements might be used against them. The motions were denied.

> The granting or denial of a motion for separate trials of jointly charged defendants is entrusted to the sound discretion of the trial court and will not be disturbed on appeal absent a manifest abuse of discretion.

*State v. Barry,* 25 Wn. App. 751, 756, 611 P.2d 1262 (1980). The defendant must be able to point to specific prejudice as a result of the joinder before denial of a motion will be overturned. *State v. Kinsey,* 20 Wn. App. 299, 579 P.2d 1347 (1978). In this case the court protected against guilt by association by granting defendants' pretrial motion to exclude evidence of prior bank robberies by some defendants. Further, several confessions were suppressed and another was edited to keep the jury from considering any incriminating statement by a defendant who might choose not to take the stand and thereby prevent a codefendant from exercising his right of confrontation. *See Bruton v. United States,* 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968); CrR 4.4(c). We find no error on this issue.

### JURY SELECTION

The next issue involves the so–called "death–qualified jury," *i.e.,* a jury in a capital case from which prospective jurors have been excluded for cause because of their attitudes toward the death penalty. In *Witherspoon v. Illinois,* 391 U.S. 510, 522 n.21, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968), the Supreme Court refused to prohibit the prosecution's power to exclude for cause those prospective jurors who could not vote to impose the death penalty regardless of the evidence or could not even vote for guilt because of the risk of subsequent imposition of the death penalty. The *Witherspoon* court struck down a statute enabling the prosecution to challenge for cause any and all jurors who express general, conscientious scruples against or opposition to capital punishment; but, although leaving the question open for future decision, the court refused to conclude

on the basis of the "tentative and fragmentary" data then before it, "that the exclusion of [all] jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction." *Witherspoon v. Illinois,* 391 U.S. at 517–18.

The defendants in this case were all charged with premeditated murder, RCW 9A.32.030(1)(a), and first degree felony–murder, RCW 9A.32.030(1)(c). They were later put on notice of the State's intent to seek the death penalty, but death penalty proceedings were not ultimately invoked because the jury found defendants guilty of felony–murder, but not guilty of premeditated murder which would have been required to trigger the special sentencing proceeding of RCW 10.94.020, 9A.32.045. Nevertheless, defendants argue that the empirical data now show a death–qualified jury is unconstitutionally prone to convict a defendant.[1]

This subject was analyzed exhaustively in the recent California Supreme Court decision of *Hovey v. Superior Court,* 28 Cal. 3d 1, 616 P.2d 1301, 168 Cal. Rptr. 128 (1980). California, like Washington, provides for exclusion for cause of jurors who would either always vote for acquittal in a capital case as a matter of conscience, or who would

---

[1]Some of the studies on the death–qualified jury, substantially as marshaled by defendant Monds, are:

Boehm, *Mr. Prejudice, Miss Sympathy, and the Authoritarian Personality: An Application of Psychological Measuring Techniques to the Problem of Jury Bias,* Wis. L. Rev. 734 (1968).

H. Zeisel, *Some Data on Juror Attitudes Towards Capital Punishment* (1968).

Rokeach & McLellan, *Dogmatism and the Death Penalty: A Reinterpretation of the Duquesne Poll Data,* 8 Duq. L. Rev. 125 (1969–70).

Bronson, *On the Conviction Proneness and Representativeness of the Death–Qualified Jury: An Empirical Study of Colorado Veniremen,* 42 U. Colo. L. Rev. 1 (1970).

Goldberg, *Toward Expansion of Witherspoon: Capital Scruples, Jury Bias, and the Use of Psychological Data To Raise Presumptions in the Law,* 5 Harv. C.R.–C.L. L. Rev. 53 (1970).

Jurow, *New Data on the Effect of a "Death Qualified" Jury on Guilt Determination Process,* 84 Harv. L. Rev. 567 (1971).

White, *The Constitutional Invalidity of Convictions Imposed by Death–Qualified Juries,* 58 Cornell L. Rev. 1176 (1973).

automatically vote for the death penalty following a conviction. *Compare Hovey,* 28 Cal. 3d at 8–9, 20 n.48, 616 P.2d at 1302, 1310, *with* RCW 4.44.170(2), 10.49.050 (purportedly superseded by CrR 6.4). In a 55–page majority opinion that discusses the leading studies on the issue of conviction proneness, *Hovey* concludes that the petitioner failed to establish that California death–qualified juries were so prosecution prone as to violate the constitutional demands of jury neutrality. Although we do not profess to have assimilated all of the literature on the subject, we are convinced that the *Hovey* rationale applies with equal force to this case.

We agree with *Hovey,* 28 Cal. 3d at 20, 616 P.2d at 1310–11 that each jury pool is likely to contain a spectrum of community viewpoints ranging from people who (1) automatically will impose the death penalty, at one extreme, through those who (2) are in favor but would not vote for it invariably, and those who (3) are indifferent, and those who (4) oppose it but might vote for it in a given case, to people who (5) will never vote for it. Courts in both Washington and California will exclude for cause those jurors who hold the two extreme attitudes. Jury pools in both states, therefore, are likely to contain only members of the middle three categories. As *Hovey* reports, at page 63, however, the scholarly studies all contained a so–called "*Witherspoon*–qualified" jury pool in which a fourth group, the "automatic death penalty" group, was represented. This additional attitudinal response distorted the data as applied to Washington and California juries, and we decline to hold that "Washington death–qualified" juries—those from which the "automatic death penalty" group is excluded—are more conviction prone than a completely neutral jury.

Furthermore, although he was not required to do so under the case law of this jurisdiction, Judge Thompson protected jury neutrality and avoided the problem of a "perceptual set," or the bias a venireman may develop by watching the voir dire of others, by conducting individual

voir dire of each prospective juror, with no other veniremen present. *See Hovey,* 28 Cal. 3d at 83–84, 616 P.2d at 1355–56 (Richardson, J., dissenting).

On another aspect of juror selection, Walter Mathis in particular urges that the court erred by denying a mistrial due to misconduct arising out of a prospective juror's alleged statement in the jury room that "I know they are all guilty." This was reported by another juror during voir dire. The juror who allegedly made the comment denied having made it when she was called for voir dire; nevertheless, the court excused her for cause as a precaution and suggested that counsel explore with other veniremen whether they had heard such a statement. On appeal, *Mathis* contends the court should have held a hearing under CrR 6.4(d) to determine if the juror was subject to challenge for cause. The record clearly indicates, however, that excusing the juror without confronting her with the other juror who reported the alleged incident was acceptable procedure to all defense counsel. The error, if any, was waived.

### Conduct of Trial

We next consider whether a mistrial should have been granted due to a testimonial remark made by Buck Harmon, who was being examined about the defendants' meetings in which they planned the bank robbery. The prosecutor asked:

[C]an you recall what it was, generally, that Jimmy Malone said to you about the prospects of robbing the bank?
[Objection]
Q. Can you tell what was said at this conversation?
A. Well, he said it would be easy, because they had done it before.

The trial judge had ruled before trial that there would be no mention of any prior bank robberies, or similar testimony, without a prior offer of proof. The remark was inherently damaging because it did not apply to some of the defendants who had not robbed other banks and who,

because of the introduction of the remark into the joint trial, could not confront the declarant as to precisely who "they" were that Malone meant by "had done it before." *See Bruton v. United States,* 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968).

█ This situation does not, however, involve evidence of a confession to the crime by one of two defendants being tried jointly for that very crime, as did *Bruton.* In the case at bench, we have a volunteered answer by a witness that suggests one or more of the defendants had committed some other crimes. We conclude, after reading the extensive trial record, that the remark did not so taint the entire proceedings as to deprive any of the defendants of a fair trial. *State v. Johnson,* 60 Wn.2d 21, 29, 371 P.2d 611 (1962). Applying the considerations set forth in *Johnson* at page 27, we find that (a) the question asked was proper, as the State was attempting to show a common plan by defendants to rob the bank; (b) the answer was responsive to the question in a way, but (c) was not the answer the State was trying to elicit; (d) the answer was a purported statement of a defendant, to be sure, and (e) defense counsel did object and move for a mistrial; but (f) the court, after adjourning the trial (the remark was made in testimony at the end of the day), did instruct the jury to disregard the statement when court reconvened the next morning, having given both sides a chance to research and argue the question; (g) no defendant took the stand to explain the remark; (h) no further remarks were made about robberies at other banks; and (i) misconduct of counsel was not involved. On this latter point, defendants Mathis and Malone argue that the prosecutor committed prejudicial misconduct by (1) failing to instruct his witness, in accordance with the court's pretrial ruling, to refrain from mentioning past robberies, and (2) deliberately directing the examination of Harmon so that such a statement would come out.

We do not believe the prosecutor engaged in misconduct as alleged, nor did trial counsel so accuse him at the time.

Apparently the witness was not instructed to avoid such a remark, but the court had not ruled specifically that such an instruction should be given, only that "no mention of any prior bank robberies" would be made. From the questioning preceding the remark and taken up on the next day, it is obvious the State was trying to elicit the details of planning the particular bank robbery that occurred on October 6. Such testimony would refute any contention by a defendant involved in the planning that he was just out for a ride with friends on October 6 when they suddenly donned ski masks and pulled him along into the bank. The statement did not deprive anyone of a fair trial in view of the court's curative instruction and the entire record of trial.

A second, unrelated allegation of misconduct concerns a remark of the deputy prosecutor during his rebuttal argument to the jury:

> Now, if any one of you can go along with what they suggest that what you have seen and heard here as to the conduct of these defendants in an attempt to escape from this thing was not in immediate flight from the robbery, when they still are wearing the very masks and carrying the very guns that they wore in the bank, when Krook first sees them, well, I guess you're going to turn these people loose on that basis, so when you do, *you'll hear Jack Lewis* [a defense lawyer] *laughing at you all the way from Yakima, I'll guarantee that.* Of course this was immediate flight and the very bottom, this is nothing less than first degree felony murder, . . .

(Italics ours.) No objection was made to this remark.

 In the absence of a request for a curative instruction on argument of counsel, and the denial of such an instruction, the argument will not be found to be reversible error unless it constituted such flagrant misconduct that no instruction could have cured it. *State v. Basford,* 76 Wn.2d 522, 457 P.2d 1010 (1969).

Although the prosecutor's argument can be interpreted as an appeal to local prejudice and may have led the jury to focus on the personality of Mr. Lewis as opposed to the

evidence at hand, the court's first instruction to the jury, which of course preceded the prosecutor's remarks, included the injunction to "disregard any remark, statement, or argument which is not supported by the evidence or the law as given to you by the court." The fact that none of the several defense lawyers present, including Mr. Lewis, objected to the remark suggests that it was not perceived as prejudicial in context. Nor do we find the remark to be so prejudicial, in view of the entire record at trial and the court's cautionary instruction, as to constitute reversible error. *State v. Basford, supra; see State v. Luoma,* 14 Wn. App. 705, 715–16, 544 P.2d 770 (1976), *rev'd on other grounds,* 88 Wn.2d 28, 558 P.2d 756 (1977).

We next consider the argument that defendants were denied due process of law because the judge who took Buck Harmon's guilty plea before trial, and was aware of the factual basis for that plea, was the same judge who presided at the trial of the remaining defendants. These facts might conceivably present a problem if the case had been tried to the court. In the case at bench, however, the jury was the weigher of the evidence and the finder of fact as to the defendants who went to trial. *See generally Duncan v. Louisiana,* 391 U.S. 145, 20 L. Ed. 2d 491, 88 S. Ct. 1444 (1968). We have examined the record carefully, and we find no indication that Judge Thompson's prior awareness of Harmon's plea was permitted to influence the jury in any way. On the contrary, we find that Judge Thompson bent over backwards to give all of the defendants and their attorneys the utmost in patience, consideration, and attention to detail. We commend him for handling a complex, lengthy, and difficult trial with great skill. No authority has been presented directly in support of the argument that a judge who takes a plea may not, before sentencing that defendant, preside over a subsequent jury trial of codefendants. In the absence of any indication that such a circumstance was permitted to influence the jury, there is no error.

Defendant Cartwright argues that the court should have

granted a mistrial because of the "prison" atmosphere during the trial. Defendant points to (1) the presence of a police dog, which was used to search the courtroom for explosives prior to each day's proceedings and was in view as veniremen arrived in the morning; (2) jurors viewing a pile of handcuffs as they entered the courtroom; (3) sheriff's deputies using a leash on defendant Cartwright as they escorted her from the courthouse during the noon hour, which jurors *might* have seen.

The judge has broad discretion in regulating the conduct of trial and may authorize reasonable security measures. *See State v. Gilcrist,* 91 Wn.2d 603, 590 P.2d 809 (1979); *State v. Crawford,* 21 Wn. App. 146, 584 P.2d 442 (1978). The record indicates a conscientious effort by the trial court to ensure courtroom decorum and security while affording defendants a fair trial. The judge took steps to remove the police dog and handcuffs from the presence of the jury after they were brought to his attention. It is not reversible error simply because jurors see defendants wearing manacles. *State v. Gilcrist, supra; State v. Berkins,* 2 Wn. App. 910, 471 P.2d 131 (1970). This trial involved multiple defendants, some with prior felony records, who were charged with a capital crime. One key witness had pleaded guilty and turned "State's evidence." The victim was a police officer and feelings no doubt ran high among some segments of the community. The court committed no error in denying a motion for mistrial due to the security measures, which were not shown to have impeded a fair trial. *State v. Gilcrist,* 91 Wn.2d at 612.

Defendants next contend they were entitled to an instruction on second degree murder. Defendants Cartwright, Moore, Monds, and Johnson urged the trial court to instruct the jury on second degree murder, arguing the evidence did not support premeditation nor flight from a felony. A defendant is entitled to a lesser–included offense instruction when there is evidence to support his theory. *State v. Johnston,* 84 Wn.2d 572, 527 P.2d 1310 (1974). But where the undisputed evidence in a murder case shows the

crime to have been committed in the course of a felony enumerated in RCW 9A.32.030(1)(c), the trial court need not instruct on lesser offenses, even as to coparticipants. *See Proll v. Morris,* 85 Wn.2d 274, 534 P.2d 569 (1975); *State v. Whitfield,* 129 Wash. 134, 224 P. 559 (1924).

RCW 9A.32.030(1)(c) includes homicide while a defendant or his accomplices are in flight from a robbery.[2] The testimony of Trooper Krook and another witness indicates an uninterrupted evasion of the authorities by those defendants who fled in the Bobcat. The flight and attendant shooting are sufficiently within the res gestae of the bank robbery to warrant only the first degree felony–murder instruction. *See State v. Anderson,* 10 Wn.2d 167, 116 P.2d 346 (1941).

## INEFFECTIVE ASSISTANCE OF COUNSEL

We turn to the argument, advanced by defendants Peyton, Malone, and Mathis, that they received ineffective assistance of counsel because the same attorney represented all of them. Joint representation of criminal defendants is to be discouraged because, despite full disclosure to the clients of the possible consequences, it will be an unusual case

---

[2]RCW 9A.32.030(1)(c) provides:

"(1) A person is guilty of murder in the first degree when:

". . .

"(c) He commits or attempts to commit the crime of either (1) robbery, in the first or second degree, (2) rape in the first or second degree, (3) burglary in the first degree, (4) arson in the first degree, or (5) kidnaping, in the first or second degree, and; in the course of and in furtherance of such crime or in immediate flight therefrom, he, or another participant, causes the death of a person other than one of the participants; except that in any prosecution under this subdivision (1)(c) in which the defendant was not the only participant in the underlying crime, if established by the defendant by a preponderance of the evidence, it is a defense that the defendant:

"(i) Did not commit the homicidal act or in any way solicit, request, command, importune, cause, or aid the commission thereof; and

"(ii) Was not armed with a deadly weapon, or any instrument, article, or substance readily capable of causing death or serious physical injury; and

"(iii) Had no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article, or substance; and

"(iv) Had no reasonable grounds to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

in which counsel will be able to foresee and avoid all possible conflicts of interests between his clients—to each of whom he owes an undivided loyalty. *See* (CPR) DR 5–105; (CPR) EC 5–15, 5–16, 5–17; *Holloway v. Arkansas,* 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173 (1978); *State v. Alexis,* 21 Wn. App. 161, 584 P.2d 963 (1978); *Developments in the Law—Conflicts of Interest in the Legal Profession,* 94 Harv. L. Rev. 1244, 1380–83 (1981).

In this case, the trial judge carefully explained to the defendants the potential hazards of joint representation, on more than one occasion. He gave them time to consider the matter and then inquired separately of each of them if he or she still wanted joint representation. All declared they did. Consequently, at trial Mr. John R. Lewis represented Peyton, Mathis and Malone, and Ms. Faith Enyeart represented Moore, Johnson and Monds. Debra Cartwright was represented separately by Mr. Robert S. Felker. Mr. Lewis, an experienced criminal lawyer, declared for the record before trial that both he and Ms. Enyeart had "covered this completely" with their clients, and that he saw no conflicts in the case.

Requiring an attorney to represent two or more codefendants whose interests are in conflict can be a denial of their Sixth Amendment right to the effective assistance of counsel. *Holloway v. Arkansas,* 435 U.S. at 481, citing *Glasser v. United States,* 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457 (1942). Joint representation of two or more defendants is not a per se constitutional violation, however; in some cases, joint representation can even be advantageous. *Holloway v. Arkansas,* 435 U.S. at 482–83. Criticized in *Holloway* was the trial court's failure "either to appoint separate counsel or to take adequate steps to ascertain whether the *risk* [of a conflict of interests] was too remote to warrant separate counsel" (italics ours) after the possibility of such a risk had been brought to the attention of the court by the defense. *Holloway v. Arkansas,* 435 U.S. at 484; *see also State v. Alexis, supra.*

The Supreme Court has recently elaborated upon this

area of the law in *Cuyler v. Sullivan,* 446 U.S. 335, 348, 64 L. Ed. 2d 333, 100 S. Ct. 1708 (1980), which holds that unless the trial court fails to give a defendant who objects to multiple representation an "opportunity to show that potential conflicts impermissibly imperil his right to a fair trial . . . a reviewing court cannot presume that the possibility for conflict has resulted in ineffective assistance of counsel." Moreover, "[i]n order to establish a violation of the Sixth Amendment [rights], a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 348. This does not mean that actual prejudice must be shown, but that "counsel actively represented conflicting interests"; indeed, the court held "the [mere] possibility of conflict is insufficient to impugn a criminal conviction." *Cuyler v. Sullivan,* 446 U.S. at 350; *accord, United States v. Freeman,* 619 F.2d 1112, 1122 (5th Cir. 1980), *cert. denied,* 450 U.S. 910, 67 L. Ed. 2d 334, 101 S. Ct. 1348 (1981).

In this case, no one even hinted to the trial court that he or she had reservations about the joint representation. On the contrary, only voices of acquiescence were heard. Judge Thompson followed both *Holloway* and *Alexis* by describing the usual dangers inherent in joint representation and by inviting the defendants and their attorneys to object to the procedure. Peyton argues that in a capital case, in which the jury might decide whether to impose the death penalty as well as the question of guilt, the problem of joint representation is particularly acute. He contends that the attorney who represents codefendants, unlike counsel representing only one person, will be unable to defend on the issue of guilt by stressing evidentiary and other factors that at least support a lesser penalty, if not an acquittal, for his client as opposed to the other defendants, because one or more of the other defendants will also be his clients. Thus, Peyton contends his attorney was unable to present mitigating circumstances that would have placed him separately in a more favorable light.

Applying *Cuyler,* we find no indication that either Mr. Lewis or Ms. Enyeart was placed in a position of actively representing conflicting interests, in the manner suggested by Peyton or otherwise. Nothing about the circumstances required the trial court to inquire further into the propriety of multiple representation; and, absent any indication of actual conflict, we may not presume that a conflict actually existed which violated any defendant's right to counsel. *Cuyler v. Sullivan, supra; United States v. Freeman, supra.*

Several defendants argue that they were denied effective assistance of counsel on other grounds, Walter Mathis specifically on the ground his attorney "denied [him] and his wife the privilege of testifying." He contends his wife would have stated they were at home at the time of the robbery. He does not specify what he would have testified, nor does he claim that his attorney failed to consult with him on the matter. Whether or not a defendant will take the stand is, of course, a matter of trial tactics that courts ordinarily will not second guess. *United States v. Ladley,* 517 F.2d 1190 (9th Cir. 1975); *see State v. Darnell,* 14 Wn. App. 432, 542 P.2d 117 (1975). As for Mathis, his attorney did present two witnesses tending to establish an alibi defense. His wife's testimony would have been cumulative and probably would have been received skeptically because of her biased position. Had Mathis taken the stand himself, he would have exposed himself to impeachment by means of his prior criminal record. There is no indication that Mr. Lewis actually prevented Mathis or his wife from testifying on any relevant issue, failed to consult with Mathis on the issue, or that the failure of Mathis to take the stand was not a legitimate tactical decision. After considering the entire record, we are convinced all defendants received thorough and vigorous representation and a fair and impartial trial. *State v. Johnson,* 92 Wn.2d 671, 600 P.2d 1249 (1979).

FELONY–MURDER STATUTE: CONSTITUTIONALITY
AND MERGER

Defendant Willie Moore contends that RCW 9A.32.030(1)(c) (the felony–murder statute) violates due process because in a case where a killing occurs during commission of a felony, the State need only show that a defendant participated in the underlying felony to prove felony–murder. The essence of this argument is that the felony–murder rule is per se unconstitutional, as the State need not prove intent to kill. This precise argument was rejected in *State v. Wanrow,* 91 Wn.2d 301, 588 P.2d 1320 (1978). *See also State v. Thompson,* 88 Wn.2d 13, 558 P.2d 202 (1977).

Furthermore, when viewed in terms of shifting the burden of proof for the affirmative defense to the defendant, RCW 9A.32.030(1)(c) does not violate due process. *Patterson v. New York,* 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319 (1977); *Victory v. Bombard,* 570 F.2d 66 (2d Cir. 1978) (construing substantially identical felony–murder statute). This allocation of the burden of proof raises a due process question only if the absence of an essential element of the crime is an affirmative defense. *State v. Gilcrist,* 25 Wn. App. 327, 606 P.2d 716 (1980). RCW 9A.32.030(1)(c) does not meet that prerequisite.

Several defendants argue that the underlying felony of robbery necessarily has merged into the greater crime of felony–murder. In *State v. Johnson, supra,* the court held at page 680 that convictions for assault and kidnaping committed in the perpetration of a rape must merge into the conviction for rape because the assault and kidnaping did not involve "some injury to the person or property of the victim or others, which is separate and distinct from and not merely incidental to the crime of which it forms an element." Applying this rule, the Court of Appeals in *State v. Fagundes,* 26 Wn. App. 477, 614 P.2d 198, *review denied,* 94 Wn.2d 1014 (1980), considered a conviction for first degree felony–murder and held that the underlying offenses of first degree rape and first degree kidnaping must merge

into the greater offense of murder.

We decline to follow *Fagundes* here. The facts set forth in *Fagundes* imply that the rape and kidnaping were "intertwined," in the phrase employed by *Johnson,* at page 681, with the killing of the victim. Not so in the case at bench, in which the crime of robbery was a separate and distinct offense from the felony–murder of which it forms an element. This jurisdiction has consistently refused to adopt the merger doctrine in cases of an assault being used to support a conviction for second degree felony–murder. *State v. Harris,* 69 Wn.2d 928, 421 P.2d 662 (1966); *State v. Thompson,* 88 Wn.2d 13, 558 P.2d 202 (1977); *State v. Wanrow,* 91 Wn.2d 301, 588 P.2d 1320 (1978). The same rationale applies to felonies relied on to charge first degree felony–murder under RCW 9A.32.030(1)(c), in which certain felonies, including first degree robbery, can be used to obtain a conviction for first degree murder without premeditation. Even many of those who have urged adoption of the merger doctrine in felony–murder cases recognize that the reasons for merger are considerably weaker when the underlying felony is not included in but independent of the homicide. *State v. Harris,* 69 Wn.2d at 931; *State v. Thompson,* 88 Wn.2d at 17, 21–25 (Utter, J., dissenting). *See* Annot., 40 A.L.R.3d 1341 (1971). Where the underlying felony used to invoke felony–murder is, as in this case, a separate and distinct act independent of the killing, we hold the lesser crime does not merge into the felony–murder conviction.

This case took 21 days to try, including voir dire lasting 13 days, and involved extensive pretrial proceedings. Several of the defendants filed pro se briefs supplementing those of their attorneys. Difficult as the appeal has been to review, the trial must have been even more challenging for the trial judge. Nevertheless, we are convinced the trial was fair and impartial for all defendants and, finding no error,

we affirm the convictions.

REED, C.J., and PETRICH, J., concur.

Reconsideration denied July 31, 1981.

Review denied by Supreme Court December 18, 1981.